[No. 51533-6. En Banc. June 19, 1986.]

STACIE C. BERING, ET AL, *Respondents,* v. SHARE, ET AL, *Appellants.*

*W. Russell Van Camp* and *Kevin O'Shaughnessy*, for appellants.

*Patrick K. Stiley* and *Jeffry K. Finer*, for respondents.

*Mark J. Hanley, Sara B. Derr*, and *Monica I. LaBeck*, amici curiae for appellants.

*Nancy Hawkins* and *Marilyn Endriss* on behalf of Northwest Women's Law Center, amici curiae.

*Gary A. Preble* on behalf of Women Exploited by Abortion, amicus curiae.

*John W. Phillips* and *James E. Lobsenz* on behalf of the American Civil Liberties Union, amici curiae.

*Janet Varon, Franklin W. Shoichet,* and *Fred Diamond-stone* on behalf of the National Lawyers Guild, amici curiae.

PEARSON, J.—No judicial task is more difficult than balancing the constitutional rights and freedoms of citizens of this country against conflicting rights and freedoms of their fellow citizens. In accepting this delicate task, we recognize there can be few absolutes under the constitutions of a state and country boasting of such a diverse people. The magnificence of the documents under which we have consented to governance lies in their flexibility to accommodate the conflicting views and lifestyles of the governed. In our role as arbiter, we cherish such flexibility.

This appeal presents two principal constitutional issues requiring the accommodation of conflicting rights. First, whether a place restriction in a permanent injunction, ordering antiabortion picketers to refrain from picketing directly in front of a medical clinic in which abortions are performed, violates either state or federal free speech protections? Second, whether a content restriction in a permanent injunction, enjoining picketers' oral use of the words "murder", "kill", and their derivatives, violates either state

or federal free speech protections? Subject to one limited qualification which follows, we answer both questions in the negative, holding that the permanent injunction does not violate picketers' free speech rights under the state or federal constitutions.

Respondent physicians Michael McCarthy, Pamela Silverstein, and Stacie Bering practice medicine in offices located in the Sixth Avenue Medical Building at W. 508 Sixth Avenue, Spokane, Washington, situated at the corner of Sixth and Stevens Avenues. See illustration. Respondent Howard Johnson is a general partner/owner of the Medical Building. The Medical Building is nine stories tall, with a single public entrance, a side door, and a rear door. The side door is locked in winter, and its stairway blocks handicapped visitors.

Over two dozen medical offices are located in the building, offering a wide range of services including family oriented health care, pediatrics; prenatal care, laboratory procedures, geriatrics, internal medicine, outpatient surgery, weight loss counseling, dentistry, psychological counseling, and elective abortions.

In December 1984, members of Share, an informal organization opposed to abortion, began picketing and sidewalk "counseling" in front of the Medical Building. At times, other antiabortion picketers who were not members of Share were present with placards at the Medical Building. Picketing occurred generally on Fridays, with a morning group usually consisting of 2 or 3 picketers, and an afternoon group of as many as 8 to 13.

The respondent physicians became concerned for their patients' welfare following face–to–face encounters between picketers and patients. Respondents filed suit in Spokane County, in part requesting a temporary restraining order. On March 7, 1985, the trial court issued a temporary restraining order, which was superseded on March 18, 1985, following a daylong show cause hearing. The court entered a permanent injunction on March 22, 1985.

There was substantial conflict between the witnesses' testimony at the show cause hearing. Respondents' evidence included live eyewitness testimony; numerous affidavits from patients, nurses, and visitors to the Medical Building;[1] and dozens of photographs of picketers at the

---

[1]Numerous affidavits were filed at the show cause hearing on March 18, 1985, in accordance with RCW 7.40.060. These affidavits were held by the court until presentment, on March 22, 1985, at which time they were filed with the clerk's

picket site. The evidence detailed episodes of picketers (1) grabbing patients and staff, (2) patrolling the sidewalk in groups, (3) blocking the sidewalk, (4) causing patients to cut across the lawn—which at times was covered with ice and snow, (5) threatening or screaming at patients who refused to take literature, (6) accusing patients or their doctors of killing babies, (7) telling one patient that she would go to hell for seeing particular doctors, (8) interfering with parents bringing young patients to see their respiratory allergist, and (9) interfering with patients in advanced stages of pregnancy.

Respondent physicians and a nurse testified that picketers interfered with ill patients, placing a pregnant woman possibly suffering from toxemia in acute medical danger, and delaying a patient who was miscarrying a wanted pregnancy and bleeding heavily. This last patient had to force her way through a group of picketers in order to reach her nurse and wheelchair.

A pediatric nurse asked picketers to please refrain from bothering Dr. McCarthy's young patients because his office did not provide abortion–related services. The picketers told the nurse to "move out" of the building. In addition to their sidewalk activity, the evidence showed that picketers entered the Medical Building, and even physicians' offices, to advocate their views on abortion.

In issuing its order, the trial court considered the live testimony from both parties, all the affidavits, diagrams, and numerous photographs depicting picketers arrayed in groups along the sidewalk in front of the Medical Building. Based on this evidence, the court issued its findings and the permanent injunction.

The court found that: (1) it had jurisdiction over the parties and subject matter; (2) picketers positioned them-

office and date stamped. Appellants' request to exclude evidence entered after March 18, 1985, cannot apply to the affidavits made available to counsel and the court before the show cause hearing, notwithstanding their date stamp of March 22, 1985. The court specifically stated that it considered all the affidavits before reaching its decision.

selves on the public sidewalks along Sixth Avenue and at the only walkway to the main entrance; (3) picketers had obstructed the passage of visitors and staff at the Medical Building; (4) picketing had caused the physicians and patients emotional distress, created a substantial risk of physical and mental harm, and "counseling" had been forced upon persons attempting to enter or leave the premises; (5) picketing had been conducted in an aggressive, disorderly, and coercive manner, and in instances gave rise to a clear and present danger to patients; (6) picketing had been conducted in a manner incompatible with the character and function of the Medical Building; and (7) picketers had repeatedly referred to physicians practicing in the Medical Building as killers or murderers in the presence of young children.

The resulting injunction prohibits picketers from (1) picketing, demonstrating, or "counseling" at the Medical Building, except along the public sidewalk north of the bus stop on Stevens Avenue; (2) threatening, assaulting, intimidating or coercing anyone entering or leaving the Medical Building; (3) interfering with ingress or egress at the building or parking lots to the south or southeast of the premises; (4) trespassing on the premises; (5) engaging in any unlawful activity directed at respondent physicians or their patients; (6) referring, in oral statements while at the picket site, to physicians or patients, staff, or clients as "murdering" or "murderers", "killing" or "killers"; or to children or babies as being "killed" or "murdered" by anyone in the Medical Building.

Subsequent to entry of the permanent injunction, the court found that picketing and counseling activities continued at the Medical Building in violation of the court order. On June 7, 1985, the court entered an order of contempt against picketers Steven Fuhrman, Richard Van Dyke, Daniel Scalf, and Alfred Derby. The findings regarding contempt of court by these individuals specifically state that the contemnors violated paragraph 1 of the March 22, 1985 order. Paragraph 1 is a geographic limitation.

On June 7, 1985, the court also assessed attorney fees of $7,000 and costs of $1,200 against Grace Gerl and Teresa Lindley for their contempt of the permanent injunction. The court imposed the order regarding fees and costs as a result of repeated contempts by Grace Gerl and Teresa Lindley. The trial court found that contemnors Gerl and Lindley had "knowingly and intentionally violated the [geographic restriction] of the permanent injunction" on at least seven occasions between the order's issuance and the date of the original contempt proceeding. Based on these findings, the trial court issued its order to impose *coercive* fines and confinement upon contemnors Gerl and Lindley.

We granted appellants' request to join review of these orders with the appeal of the permanent injunction in order to dispose of the case in its entirety.

I
#### EVIDENTIARY SUPPORT FOR INJUNCTION

█ Share assigns error to many of the trial court's findings of fact and argues the permanent injunction lacks evidentiary support in the record. In Washington, findings of fact supported by substantial evidence will not be disturbed on appeal. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959). Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair–minded, rational person of the truth of the declared premise. *In re Snyder*, 85 Wn.2d 182, 185–86, 532 P.2d 278 (1975).

█ Share sharply disputes the trial court's findings, and argues that this court should substitute its findings for those of the trial court because the trial court based its findings in part on affidavits and photographs. Although this court is not necessarily bound by the trial court's findings when based *solely* upon written or graphic evidence, *State v. Rowe*, 93 Wn.2d 277, 609 P.2d 1348 (1980), the trial court in this case also considered considerable live testimony during a daylong show cause hearing. Accordingly, because the rule enunciated in *State v. Rowe, supra,* does

not apply, this court must affirm the trial court's findings if supported by substantial evidence.

After reviewing the entire record, which includes a full day of live testimony, numerous affidavits, and approximately 100 photographs, we conclude substantial evidence exists to support the trial court's findings.

## II
### PLACE RESTRICTION
#### A. Federal Constitution

Share argues that the trial court violated picketers' First Amendment rights by issuing an injunction imposing a place restriction upon the picketers' activities. The injunction limited picketing to the public sidewalk north of the bus stop bench at the northwest corner of the intersection of Stevens and Sixth Avenues. See illustration. According to Share, this restriction is not a reasonable place restriction, and thus violates the picketers' First Amendment free speech rights.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . ." The rights of free speech and peaceable assembly are fundamental rights which are safeguarded against State interference by the due process clause of the Fourteenth Amendment. *De Jonge v. Oregon,* 299 U.S. 353, 364, 81 L. Ed. 278, 57 S. Ct. 255 (1937). The issuance of the permanent injunction by the trial court constitutes State action. *See Shelley v. Kraemer,* 334 U.S. 1, 17, 92 L. Ed. 1161, 68 S. Ct. 836, 3 A.L.R.2d 441 (1948); *American Fed'n of Labor v. Swing,* 312 U.S. 321, 85 L. Ed. 855, 61 S. Ct. 568 (1941). Thus, Share is entitled to the protection afforded by the First Amendment.

As a general matter, peaceful picketing and leafletting are expressive "speech" activities protected by the First Amendment. *United States v. Grace,* 461 U.S. 171, 176, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983). Furthermore, places historically associated with the free exercise of expressive activities, such as streets and sidewalks, are considered

"public forums". *Grace,* at 177. In such places, the First Amendment sharply curtails the government's ability to permissibly restrict expressive conduct.

 Nevertheless "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 69 L. Ed. 2d 298, 101 S. Ct. 2559 (1981). A state may impose reasonable time, place and manner restrictions upon all expression, whether written, oral or symbolized by conduct. *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 82 L. Ed. 2d 221, 227, 104 S. Ct. 3065 (1984). Such restrictions[2] are valid if they "are content–neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Grace,* at 177 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983).

1. Content Neutrality

As stated in *Heffron,* "[a] major criterion for a valid time, place, and manner restriction is that the restriction 'may not be based upon either the content or subject matter of speech.'" *Heffron,* 452 U.S. at 648 (quoting *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 536, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980)). The trial court justified the place restriction on the factual grounds that (1) the picketers had obstructed ingress into and egress from the Medical Building by physically blocking the sidewalk and pathway leading to the main entrance; and (2) the "aggressive, disorderly, and coercive" nature of the picketing and "counseling" created a substantial risk of physical and mental harm to physicians, patients and visitors.

---

[2] As discussed with respect to the second constitutional issue, "[a]dditional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace,* 461 U.S. 171, 177, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983).

Based upon these findings, the court found further that the picketers' *conduct* had given rise to a clear and present danger to patients and physicians, and the picketers' *conduct* was incompatible with the character and function of the Medical Building. These findings, which are supported by substantial evidence in the record, clearly are not related to the content of picketers' speech, but rather to the way in which they conducted themselves at the picket site.

Although only antiabortion picketers are bound by the geographic restriction of picketing to Stevens Avenue, that in itself cannot be viewed as content regulation. The trial court imposed the place restriction in order to regulate the conduct of a particular group of persons before the court. A similar restriction which enjoined all picketers of any persuasion, regardless of their conduct, would have been overly broad. *See Beckerman v. Tupelo,* 664 F.2d 502, 507 (5th Cir. 1981) (citing *Thornhill v. Alabama,* 310 U.S. 88, 97, 84 L. Ed. 1093, 60 S. Ct. 736 (1940)). In short, the geographic restriction does not constitute content regulation proscribed by the First Amendment.

### 2. Significant State Interest

A valid place restriction also must "serve a significant governmental interest." (Citations omitted.) *Heffron,* 452 U.S. at 649. Here, the principal justifications for the trial court's geographical restriction were (1) to facilitate actual ingress into and egress from the Medical Building, and (2) to avoid the heightened coercive impact suffered by patients, staff and visitors due to the conduct of the picketers in close proximity to the only public entrance to the Medical Building.

A litany of Supreme Court cases recognize that the State has a substantial interest in keeping community streets and sidewalks open and available for movement of people and property. *See Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 83 L. Ed. 1423, 59 S. Ct. 954 (1939); *Schneider v. New Jersey,* 308 U.S. 147, 160–61, 84 L. Ed. 155, 60 S. Ct. 146 (1939); *Lovell v. Griffin,* 303 U.S. 444, 451, 82 L. Ed.

949, 58 S. Ct. 666 (1938); *Cantwell v. Connecticut,* 310 U.S. 296, 306–07, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A.L.R. 1352 (1940); *Cox v. New Hampshire,* 312 U.S. 569, 574, 85 L. Ed. 1049, 61 S. Ct. 762, 133 A.L.R. 1396 (1941). In *Cox v. Louisiana,* 379 U.S. 559, 564, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965), the Court indicated that because of the special nature of the place, persons could be constitutionally prohibited from picketing in or near a courthouse with the intent of interfering with, obstructing, or impeding the administration of justice. Likewise, in *Cameron v. Johnson,* 390 U.S. 611, 616, 20 L. Ed. 2d 182, 88 S. Ct. 1335 (1968), the Supreme Court upheld a statute which prohibited picketing "in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from" any courthouse.

In *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 649–50, 69 L. Ed. 2d 298, 101 S. Ct. 2559 (1981), the Court recognized a State's significant interest in maintaining "the orderly movement" of a crowd at a large state fair. The Court began by noting that "a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron,* at 650. After recognizing that "consideration of a forum's special attributes is relevant to the constitutionality of a regulation", the Court went on to distinguish public streets from a public fairground, noting that "any comparisons to public streets are necessarily inexact." *Heffron,* at 650–51.

Admittedly, a public sidewalk differs markedly from a large public fairground. Nevertheless, an examination of the special attributes of the Sixth Avenue sidewalk and the facility it fronts convinces this court that there is a significant State interest in regulation. As shown by numerous photographs, the sidewalk is relatively narrow; if two people are walking abreast, a third cannot pass. In the winter, when there is snow on the ground, the sidewalk only can accommodate persons walking single file. Most importantly, this narrow sidewalk fronts a medical clinic which provides

needed, and sometimes emergency, medical care to citizens of the state.

In *Tinker v. Des Moines Indep. Comm'ty Sch. Dist.,* 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969) the Supreme Court held the school district could not punish students for wearing black armbands to school in protest of the Vietnam war. In *Grayned v. Rockford,* 408 U.S. 104, 117–18, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972), however, the Court dismissed the idea that *Tinker* stood for the proposition that anyone had "an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes." According to the Court, the "crucial question is whether the manner of expression is basically incompatible with the normal activity of a particular place at a particular time." *Grayned,* at 116.

The trial court found that picketers blocked ingress and egress of patients visiting the Medical Building. This type of conduct clearly is incompatible with the normal activity of the Medical Building—the treatment of persons requiring medical care. In *Grayned,* the Court recognized that the city had a "compelling interest in having an undisrupted school session conducive to the students' learning . . ." *Grayned,* at 119. Likewise, this State has an equally substantial interest in ensuring its citizens unimpeded access to necessary medical care. In the trial court's opinion, this interest could be served only by restricting picketing to Stevens Avenue, away from the public entrance to the Medical Building. Even if the State's interest might be served adequately by a more narrowly tailored injunction, we believe the State has a compelling interest in geographically restricting the picketing to Stevens Avenue.

As stated above, the second principal justification for the place restriction was to reduce the coercive impact of picketing upon staff and patients of the medical clinic. In *Heffron v. International Soc'y for Krishna Consciousness, Inc., supra,* the petitioners asserted the State's interest in protecting fairgoers from being harassed or otherwise bothered,

likening fairgoers to the "captive audience" discussed in *Lehman v. Shaker Heights,* 418 U.S. 298, 41 L. Ed. 2d 770, 94 S. Ct. 2714 (1974). The Court concluded, however, that it need not reach the constitutional sufficiency of that particular interest because of its holding that the regulation was justified solely by the State's interest in crowd control. *Heffron,* 452 U.S. at 650. Thus, the question remains whether a State's interest in reducing the coercive impact of protected expressive activity is sufficiently significant to warrant a reasonable place restriction.

Speech does not lose its protected character simply because it may embarrass others or coerce them into action. *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 910, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971). According to the Supreme Court, "[t]here is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide–open.'" *Claiborne,* at 913 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964)). In the words of Justice Rutledge, "'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins,* 323 U.S. 516, 537, 89 L. Ed. 430, 65 S. Ct. 315 (1945).

 Notwithstanding our "profound national commitment" to free speech, the First Amendment admits of no absolutes. The Supreme Court has "regularly rejected the assertion that people who wish 'to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.'" (Citations omitted.) *United States v. Grace,* 461 U.S. 171, 177–78, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983). This flexibility in First Amendment doctrine is reflected by the principle that speech may be regulated in order to serve a substantial state interest. Accordingly, it follows that the State may regulate even coercive speech if a sufficiently significant interest exists for doing so.

In *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), the Supreme Court held that a constitutional right of privacy[3] protects a woman's decision whether to have an abortion.[4] *Roe v. Wade,* at 153. The right of privacy in this context involves different interests, including a woman's freedom to make a decision to have an abortion and to be able to effectuate that decision. *See Whalen v. Roe,* 429 U.S. 589, 599–600, 51 L. Ed. 2d 64, 97 S. Ct. 869 (1977); *Family Life League v. Department of Pub. Aid,* 132 Ill. App. 3d 929, 931–32, 478 N.E.2d 432, 434 (1985). The right of privacy dictates protection of the private relationship between a woman and her physician, *Roe v. Wade,* at 153, and the physician's right to freely practice medicine and perform legal abortions without coercive outside restraints. *See Nyberg v. Virginia,* 495 F.2d 1342, 1344 (8th Cir.), *cert. denied,* 419 U.S. 891 (1974).

The ability of a woman to make and effectuate her decision to obtain an abortion depends upon relatively free access to the counseling and care of a licensed physician. Similarly, both the abortion decision and the woman's ability to effectuate that decision necessarily are dependent upon and intertwined with the willingness and ability of the physician to provide the care and counseling sought by

---

[3]This constitutional right of privacy is "founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action . . ." *Roe v. Wade,* 410 U.S. 113, 153, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). Thus, respondent physicians could not successfully bring a constitutionally based privacy action against Share on behalf of their patients, even though they otherwise have standing, *Singleton v. Wulff,* 428 U.S. 106, 113–18, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976), because Share's activity does not constitute State action. Nevertheless, for the purpose of defining a State's interest in a reasonable place restriction, this court recognizes the constitutional protection afforded the right to an abortion. The State's interest in protecting this privacy right can be no less substantial than the interest in imposing a protective order in discovery to accommodate the privacy interests of litigants and third parties. *See Rhinehart v. Seattle Times Co.,* 98 Wn.2d 226, 654 P.2d 673 (1982), *aff'd,* 467 U.S. 20, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984).

[4]*Roe v. Wade, supra,* recently was reaffirmed in *Thornburgh v. American College of Ob. & Gyn.,* ___ U.S. ___, 90 L. Ed. 2d 779, 106 S. Ct. 2169 (1986).

the patient. *See Akron v. Akron Ctr. for Reproductive Health, Inc.,* 462 U.S. 416, 76 L. Ed. 2d 687, 103 S. Ct. 2481 (1983). As stated by the Court in *Akron,* at 427, "the full vindication of the woman's fundamental right necessarily requires that her physician be given 'the room he needs to make his best medical judgment.'" (Citations omitted.)

As the foregoing suggests, picketing in close proximity to a clinic in which abortions are provided can be expected to impinge upon a woman's constitutional right of privacy in two ways. First, the very presence of antiabortion picketers directly in front of the clinic could have such a coercive impact upon a woman that she forgoes the exercise of that right or seeks to exercise it elsewhere under the care of a licensed or unlicensed physician not of her first choosing. If a woman decides to visit the clinic anyway, picketers' conduct actually might have a deleterious impact upon the procedure itself. As recently noted by a federal district court judge,

> Women entering and leaving clinics have been verbally harassed; the effect of such harassment has been to increase the level of anxiety a woman feels and to exacerbate any emotional problems associated with the abortion decision and procedure which in turn may have an adverse effect on the medical procedure itself and on the patient's psychological well–being thereafter.

*American College of Ob. & Gyn. v. Thornburgh,* 613 F. Supp. 656, 666 (E.D. Pa. 1985), *aff'd,* ___ U.S. ___, 90 L. Ed. 2d 779, 106 S. Ct. 2169 (1986). These consequences are unacceptable given the constitutional protection afforded the abortion decision by *Roe v. Wade.*

Second, continued harassment of physicians as they enter their lawful place of business may cause them to refuse to perform legal abortions for women. Accordingly, women would be denied the opportunity to effectuate their constitutional right to obtain an abortion within the ambit of *Roe v. Wade.* In the words of an Illinois appellate court,

> [r]ecognition of this reality is a significant consideration here. In our present social climate of dangerous emo-

tional highs on both sides of the abortion issue, it can hardly be denied that the insidious threat of harassment and harm to physicians performing legal abortions and the terrorism of abortion clinics by antiabortion vigilante groups are very real.

*Family Life League,* at 932.

In Washington, such harassment has "persuaded" physicians in numerous counties to stop performing abortions. Antiabortionists "have proclaimed 21 counties 'abortion–free zones' and announced plans to put pressure on physicians in Washington's other 18 counties." Seattle Post–Intelligencer, Aug. 22, 1985, at A1, col. 2. Amici set forth the statistics regarding clinic harassment and violence, including the arson attacks on clinics performing abortion services in Bellingham and Everett. Although members of Share have not engaged in such violence, the trial court found their picketing was "aggressive, disorderly, and coercive", and that therefore physicians had a well grounded fear for the continued viability of their lawful medical practice.

If this harassment continues, we can reasonably conclude that the respondent physicians eventually might refuse to participate in a woman's abortion decision. On the other hand, if the respondent building owner perceives a serious impact upon his ability to fill tenancies in the Medical Building due to such harassment, he might be unwilling to execute or renew leases with physicians who provide abortions. Either way, the coercive presence of the picketers directly in front of the Medical Building would severely compromise the ability of a woman to effectuate the abortion decision, in turn violating the woman's constitutional right of privacy under *Roe v. Wade, supra.* Given this court's previous commitment to personal privacy, *see, e.g., State v. Koome,* 84 Wn.2d 901, 530 P.2d 260 (1975) (minor's right to abortion); *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983) (patient's right to die); *In re Rosier,* 105 Wn.2d 606, 717 P.2d 1353 (1986) (privacy interest in personal information), protection of that right, even from pri-

vate invasion, constitutes a compelling state interest justifying a reasonable place restriction on picketing.

### 3. Narrowly Drawn Injunction

■ A state clearly "may serve its legitimate interests, but it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." (Citations omitted.) *Schaumburg v. Citizens for a Better Env't,* 444 U.S. 620, 637, 63 L. Ed. 2d 73, 100 S. Ct. 826 (1980). Thus, although an injunction barring all speech might constitute an unconstitutional prior restraint, *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625 (1931), a reasonable place restriction narrowly tailored to serve a significant state interest does not violate the First Amendment. *See Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 654, 69 L. Ed. 2d 298, 101 S. Ct. 2559 (1981). To determine whether the necessary nexus exists, the court must compare the identified state interest with the terms and effect of the injunctive relief.

As set forth above, the State has a *compelling* interest in maintaining ingress and egress of its citizens into and out of medical buildings to permit convenient access to medical care. Likewise, the State has a *compelling* interest in protecting a woman's ability to effectuate her constitutional right to obtain an abortion by mitigating the harassing effect of antiabortion picketers. The trial court's place restriction requires picketers to restrain their activities to Stevens Avenue, away from the building's entrance and the sidewalk fronting the building.

This place restriction clearly serves the State's interest. Under the terms of the injunction, all interference with ingress and egress has been eliminated. Furthermore, restriction of the picketing to Stevens Avenue can be expected to mitigate the severe emotional impact otherwise experienced by many patients, especially women who are visiting the Medical Building for abortion–related services. Thus, the only question is whether the injunctive relief was

tailored as narrowly as possible to serve the State's interest.

With respect to the State's interest in maintaining ingress and egress, the injunction arguably could be narrowed without compromising that interest. The injunction could (1) limit the number of picketers, (2) require them to remain a certain distance from the walkway leading to the entrance, (3) require them to picket in single file, or (4) all of the above. By narrowing the injunction, the State could serve its significant interest in maintaining convenient access to medical care without unduly limiting the picketers' expressive activities.

In *Parkmed Co. v. Pro–Life Counselling, Inc.*, 110 Misc. 2d 369, 442 N.Y.S.2d 396 (1981), a New York trial court enjoined antiabortion picketers from demonstrating or picketing on the steps and plaza area of an abortion clinic. On appeal, the New York Supreme Court, Appellate Division, struck down this portion of the injunction on the ground that it "was overly broad and unnecessarily restricted peaceful picketing and demonstrating . . ." *Parkmed Co. v. Pro–Life Counselling, Inc.*, 91 A.D.2d 551, 552, 457 N.Y.S.2d 27 (1982). Likewise, some might argue that the injunction at issue in this case is broader than necessary, thereby prohibiting peaceful, controlled picketing that does not impede ingress or egress.

Nonetheless, focusing upon the State's interest in protecting a woman's constitutional right of privacy, we believe the injunction is tailored as narrowly as possible to effectuate that interest. An injunction which permitted any antiabortion picketing on the Sixth Avenue sidewalk would not adequately serve the State's compelling interest in protecting a woman's constitutional right of privacy from the coercive impact generated by the presence of the picketers in front of the Medical Building. In the absence of a place restriction, women visiting the clinic for abortion–related services would be forced to walk a gauntlet of placard–carrying antiabortionists. Even if all picketers agreed to refrain from using "harassing language", it is difficult to ascertain what constitutes "harassment" in the apprehen-

sive mind of a woman coming face–to–face with the picketers. By restraining picketing to Stevens Avenue, the court can avoid conjecture on this point, knowing that the woman's right of privacy is protected to the extent permissible under the First Amendment.

### 4. Ample Alternatives

For the injunction to be valid as a place restriction, "it must also be sufficiently clear that alternative forums for the expression of [appellants'] protected speech exist despite the effects of the [injunction]." *Heffron,* at 654. According to the Court in *Heffron,* "[t]he First Amendment protects the right of every citizen to 'reach the minds of willing listeners and to do so there must be opportunity to win their attention.'" *Heffron,* at 655 (quoting *Kovacs v. Cooper,* 336 U.S. 77, 87, 93 L. Ed. 513, 69 S. Ct. 448 (1949)). The trial court's place restriction does not fall afoul of these principles.

First, the injunction does not prevent Share from picketing anywhere in the city, except upon a limited stretch of sidewalk fronting the Medical Building. Thus, the injunction is not subject to the same attack raised in *Near v. Minnesota ex rel. Olson, supra,* or *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971). Second, the First Amendment does not afford Share the right to a captive audience,[5] but rather the opportunity to win the attention of passersby and engage them in conversation if the latter so desire. The injunction does not prevent Share from picketing at a point reasonably close to the Medical Building and the people Share wishes to address. The signs carried by the picketers clearly are visible to anyone entering the building. Picketers "are not secreted away in some nonaccessible location", *Heffron,* 452 U.S. at 655 n.16, but are located in plain view of per-

---

[5]As stated in *Cox v. Louisiana,* 379 U.S. 536, 555, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965), "[a] group of demonstrators could not insist upon the right to cordon off . . . [an] entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."

sons entering the Medical Building. If anyone desires to engage them in conversation, it is a very short walk to the end of the block where picketers are free to "counsel". Accordingly, the injunction provides an alternative forum providing ample opportunity for communicative activity.

## B. State Constitution

Share argues that the place restriction violates article 1, section 5 of the Washington Constitution, which provides that "[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." Two questions must be resolved. First, whether the picketing as described in the trial court's findings constitutes an abuse of the right of free speech under article 1, section 5. Second, the extent to which a Washington court may restrict the time, place and manner of the exercise of free speech rights when abuse is shown.

As stated previously, the trial court imposed a place restriction in the permanent injunction because (1) picketers were impeding ingress into and egress from the Medical Building, and (2) the aggressive, disorderly and coercive nature of the picketing and counseling created a substantial risk of harm to physicians, patients and visitors. Although Washington extends broad protections to speech under article 1, section 5, *State v. Coe,* 101 Wn.2d 364, 679 P.2d 353 (1984), reason dictates that Washington's constitutional protection does not extend to the picketing as described in the trial court's findings of fact. We believe Share picketers abused their speech rights by blocking ingress and egress and by engaging in coercive and disorderly picketing in front of a medical facility offering needed medical services to citizens of this state. Such picketing clearly impedes access to health care, and especially impinges upon women's constitutional right to make and effectuate the abortion decision.

Because Share's picketing constitutes an abuse of the right of free speech, we must determine the extent to which the trial court could impose reasonable time, place and

manner restrictions consistent with Const. art. 1, § 5. As yet, the court has not enunciated a separate and independent state doctrine for analyzing time, place and manner restrictions under Washington's constitution. In *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 245, 635 P.2d 108 (1981), the court cited Supreme Court precedent for the proposition that "[n]o one has an absolute right to free speech. The time, manner, and place of the exercise of that right may be regulated." (Citations omitted.)

██ Although the free speech clauses of the state and federal constitutions are different in wording and effect, our confidence in the general federal analysis prompts our adoption of much of this methodology for application in state constitutional cases. We do diverge, however, from the Supreme Court on the State interest element of the time, place and manner test, as we believe restrictions on speech can be imposed consistent with Const. art. 1, § 5 only upon showing a compelling State interest.

Henceforth, time, place and manner restrictions may be imposed whenever the right of free speech under Const. art. 1, § 5 has been abused, but only if the restrictions (1) are content neutral, (2) are narrowly tailored to serve a compelling State interest, and (3) leave open ample alternative channels of communication. In this case, our analysis of the place restriction under federal law leads us to the same conclusion under our constitution, and for the same reasons. Accordingly, we hold the place restriction in the permanent injunction does not violate article 1, section 5 of the Washington Constitution.

## III
### CONTENT RESTRICTION
### A. Federal Constitution

Share argues that the content restriction in the injunction, prohibiting the use of the words "murder", "kill" and their derivatives, constitutes an unconstitutional prior restraint. After reviewing numerous First Amendment cases

recently decided by the Supreme Court, we conclude that the doctrine of prior restraint is inapplicable to this case.

The Supreme Court first enunciated the doctrine of prior restraint in *Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 75 L. Ed. 1357, 51 S. Ct. 625 (1931). In *Near,* the State successfully obtained a permanent injunction against an allegedly malicious, scandalous and defamatory newspaper for violation of a state statute prohibiting such publications. The Court struck down the statute on the ground that it constituted an impermissible prior restraint, which the Court characterized as "the essence of censorship." *Near,* at 713. The Court indicated the important distinction between prior restraint and subsequent punishment, noting that libel laws were the appropriate means of regulating expression. *Near,* at 715.

In *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971), the Court struck down an injunction which prohibited publication "of any kind" that criticized the business practices of a real estate broker. In *Keefe,* the Court compared the injunction in that case to the statute in *Near,* noting that "[h]ere, as in that case, the injunction operates, not to redress alleged private wrongs, but to suppress, on the basis of previous publications, distribution of literature 'of any kind' in a city of 18,000." *Keefe,* at 418–19.

The injunction in this case differs from the injunction in *Keefe* in two important respects. First, the respondents' only purpose in seeking the injunction was to "redress alleged private wrongs", both past and prospective, suffered by the respondents and their patients. Second, the injunction ultimately obtained did not suppress speech "of any kind", but rather particular words which the trial judge feared would have an adverse impact on young children visiting the clinic. In short, this is not the classic prior restraint described in *Near* or *Keefe,* and the doctrine of prior restraint should not be applied to this case.

Regardless, several recent Supreme Court cases indicate that a new form of analysis will be employed whenever a

state regulates the content of speech. *See Carey v. Brown,* 447 U.S. 455, 465, 65 L. Ed. 2d 263, 100 S. Ct. 2286 (1980); *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 540, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980); *Widmar v. Vincent,* 454 U.S. 263, 270, 70 L. Ed. 2d 440, 102 S. Ct. 269 (1981); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983); *United States v. Grace,* 461 U.S. 171, 177, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983); *Members of City Coun. v. Taxpayers for Vincent,* 466 U.S. 789, 80 L. Ed. 2d 772, 786, 104 S. Ct. 2118 (1984). Several of these cases are classic prior restraint cases, yet the doctrine is unmentioned.

In *Police Dep't v. Mosley,* 408 U.S. 92, 95, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972), the Supreme Court stated that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its *content.*" (Italics ours.) Eight years later, in *Carey v. Brown, supra,* the Court indicated its willingness to retreat from its absolute ban on content regulation.[6] In *Consolidated Edison Co. v. Public Serv. Comm'n,* 447 U.S. 530, 65 L. Ed. 2d 319, 100 S. Ct. 2326 (1980), decided the same year as *Carey,* the Court affirmatively stated that "[w]here a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edison,* at 540.

■ The litany of cases cited above all phrase the test similarly: content regulation, including "an absolute prohibition on a particular type of expression[,] will be upheld only if narrowly drawn to accomplish a compelling governmental interest." *United States v. Grace, supra* at 177 (citing *Perry Educ. Ass'n,* at 46; *Widmar v. Vincent, supra*).

---

[6]In *Carey v. Brown,* 447 U.S. 455, 465, 65 L. Ed. 2d 263, 100 S. Ct. 2286 (1980) the Court stated that "we might agree that certain state interests may be so compelling that where no adequate alternatives exist a content–based distinction—if narrowly drawn—would be a permissible way of furthering those objectives . . ."

Thus, contrary to what the parties argue, the issue before us is not whether the content restriction constitutes a prior restraint, but whether the restriction serves a compelling State interest, and is narrowly drawn to serve that interest.

### 1. Compelling State Interest

In issuing the permanent injunction, the trial court specifically found that the picketers repeatedly used the words "kill", "killing", "killer", "murder", "murderer" and "murdering" "in indiscriminate connection with physicians and in the presence of young children . . ." Based upon medical testimony, the court found further that use of such words had "inflicted trauma upon the children overhearing such references and . . . by their very utterance . . . harmed the doctor–patient relationship essential to the effective delivery of health care."

Based upon these findings, which are supported by substantial evidence in the record, the trial court enjoined Share picketers from orally referring, while at the picket site, to physicians, patients and staff as "murdering", "murderers", "killing", or "killers". Furthermore, the trial court enjoined oral statements by picketers, while at the picket site, to children or babies as being "killed" or "murdered" by anyone in or connected to the Medical Building. The court, however, did not enjoin the printed use of these words on the picket signs themselves, as it correctly assumed such an injunction would violate state and federal constitutional protections. The question is whether the State has a compelling interest in protecting such children by limiting the oral expression of the proscribed words at the picket site.

Share relies heavily upon *O.B.G.Y.N. Ass'ns v. Birthright of Brooklyn & Queens, Inc.*, 64 A.D.2d 894, 407 N.Y.S.2d 903 (1978) which held unconstitutional an injunction prohibiting abortion picketers' use of the words "murder", "kill" and similar words on placards. Two observations regarding *O.B.G.Y.N.* are worth noting. First, *O.B.G.Y.N.* is factually distinguishable from this case in that the trial

court here did not enjoin the use of such words on the picketers' placards; it only enjoined the oral expression of such words. Second, and more important, *O.B.G.Y.N.* was decided 2 years prior to the decision in *Consolidated Edison,* in which the Supreme Court held that content regulation was permissible if it served a compelling state interest and was narrowly tailored to serve that interest. *Consolidated Edison,* 447 U.S. at 540. The court in *O.B.G.Y.N.* relied upon *Police Dep't v. Mosley, supra,* and its absolute ban on content regulation, from which the Supreme Court has since retreated. *See Consolidated Edison.* Accordingly, *O.B.G.Y.N.* provides very limited guidance on whether the First Amendment protects the words proscribed in this case. We believe the Supreme Court itself has provided the guidance we seek.

For example, in *Ginsberg v. New York,* 390 U.S. 629, 20 L. Ed. 2d 195, 88 S. Ct. 1274 (1968), the Supreme Court reviewed an obscenity statute which prohibited the sale of "girlie" magazines to children under 17. After noting that such magazines were not obscene for adults, *Ginsberg,* at 634 (citing *Redrup v. New York,* 386 U.S. 767, 18 L. Ed. 2d 515, 87 S. Ct. 1414 (1967)), the Court recognized the state's power to regulate dissemination of such material to minors. Although the Court rejected the notion that the statute invaded minors' constitutionally protected right to view the material, the Court stated that "we have recognized that even where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults. . . .'" *Ginsberg,* at 638 (quoting *Prince v. Massachusetts,* 321 U.S. 158, 170, 88 L. Ed. 645, 64 S. Ct. 438 (1944)).

The Court in *Ginsberg* offered two distinct justifications for its conclusion that the "well–being of its children is . . . a subject within the State's constitutional power to regulate . . ." *Ginsberg,* at 639. First, the Court asserted that under the federal constitution "the parents' claim to authority . . . to direct the rearing of their children is basic in the structure of our society." *Ginsberg,* at 639. According to

the Court, parents and teachers, "who have this primary responsibility for children's well–being are entitled to the support of laws designed to aid discharge of that responsibility." *Ginsberg,* at 639. Likewise, parents of children visiting the Medical Building are entitled to explain the concept of abortion to their children personally, and only when they believe the children are able to understand it. Furthermore, parents are entitled to the State's protection of their children from the potentially harmful effects caused by the proscribed speech.

Second, the Court found that the State has an "independent interest in the well–being of its youth." *Ginsberg,* at 640. According to the *Ginsberg* Court, it "recognized that the State has an interest 'to protect the welfare of children' and to see that they are 'safeguarded from abuses' which might prevent their 'growth into free and independent well–developed men and citizens.'" *Ginsberg,* at 640–41. The Court concluded that exposure to the materials proscribed constituted such an "abuse", and upheld the State statute. Likewise, this state has an interest in preventing the "abuse" suffered by young children hearing the proscribed words just before they visit their doctors.

In *FCC v. Pacifica Found.,* 438 U.S. 726, 57 L. Ed. 2d 1073, 98 S. Ct. 3026 (1978), the Federal Communications Commission issued an order indicating it might impose later sanctions on a radio station that broadcast George Carlin's monologue, entitled "Filthy Words", which aired during the early afternoon when children were listening. In a plurality opinion, the Supreme Court upheld the Commission's order, reversing a Court of Appeals decision which had reversed the Commission.

In his concurring opinion, Justice Powell conceded that the "Filthy Words" monologue was not "obscene" in the constitutional sense, nor did it constitute "fighting words" within the meaning of *Chaplinsky v. New Hampshire,* 315 U.S. 568, 86 L. Ed. 1031, 62 S. Ct. 766 (1942). Justice Powell recognized that Carlin could not be punished, consistent with the First Amendment, for delivering the same mono-

logue to a live audience composed of adults. Likewise, he assumed that an adult could not constitutionally be prohibited from purchasing a recording or a transcript of the monologue and playing or reading it in the privacy of his home. *FCC v. Pacifica Found., supra* at 756–57 (Powell, J., concurring). According to Justice Powell, however, the issue was whether the Commission could impose civil sanctions on the radio station for broadcasting the monologue during the early afternoon. Answering the question in the affirmative, Justice Powell found "strong support" for the Commission's holding in its concern to prevent the language from reaching the ears of unsupervised children who were likely to be in the audience at that hour. *Pacifica Found.,* at 757.

Justice Powell stated that "[t]he Court has recognized society's right to 'adopt more stringent controls on communicative materials available to youths than on those available to adults.'" *Pacifica Found.,* at 757 (quoting *Erznoznik v. Jacksonville,* 422 U.S. 205, 212, 45 L. Ed. 2d 125, 95 S. Ct. 2268 (1975)). According to Justice Powell, "[t]his recognition stems in large part from the fact that 'a child . . . is not possessed of that full capacity for individual choice which is the presupposition of First Amendment guarantees.'" (Citation omitted.) *Pacifica Found.,* at 757. In characterizing repetition of the words used by Carlin as "verbal shock treatment", Justice Powell stated that

> children may not be able to protect themselves from speech which, although shocking to most adults, generally may be avoided by the unwilling through the exercise of choice. At the same time, such speech may have a deeper and more lasting negative effect on a child than on an adult. For these reasons, society may prevent the general dissemination of such speech to children, leaving to parents the decision as to what speech of this kind their children shall hear and repeat . . .

*Pacifica Found.,* at 757–58.

Justice Powell's concern for the welfare of children is particularly applicable to this case, in which the use of the proscribed words arguably was intended as "verbal

shock treatment". Although the State has a lesser interest in regulating such words when directed to adults, there is a compelling state interest in preventing the harm perceived by the trial court when such words are heard by children. Unlike the courtroom audience in *Cohen v. California*, 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780, *reh'g denied*, 404 U.S. 876 (1971),[7] children entering the Medical Building cannot avoid this harm by simply averting their gaze, but rather are subject to it until safely out of earshot. Similarly, unlike the children in *Pacifica Found.*, children visiting the Medical Building cannot tune in to a different station or tune out completely; they cannot avoid hearing the proscribed language while in the picketers' vicinity. Accordingly, the State in this case has a compelling interest in avoiding subjection of children to the physical and psychological abuse inflicted by the picketers' speech.

## 2. Narrowly Drawn

As stated above, an injunction imposing an absolute prohibition on a particular type of expression must be narrowly drawn to serve the State's interest. *United States v. Grace*, 461 U.S. 171, 177, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983). *See, e.g., Erznoznik v. Jacksonville, supra* at 213 (restriction aimed at prohibiting youths from viewing films involving nudity impermissibly broad because not all nudity deemed obscene even as to minors). The State's interest in this case is to prevent the physical and psychological harm of young children caused by use of the proscribed words.

---

[7]The importance of context in free speech cases is illustrated by the case of *Cohen v. California*, 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780, *reh'g denied*, 404 U.S. 876 (1971), which arose when Paul Cohen entered a courthouse wearing a jacket emblazoned with the words "Fuck the Draft". In holding that criminal sanctions against Cohen were unconstitutional, the Court rejected the argument that his speech would offend unwilling listeners. *Cohen*, at 22. Although the courthouse audience could avoid the offensive speech when simply printed on an article of clothing, members of the Court have indicated a different result might obtain when similar words are spoken orally in the presence of children. *See Rosenfeld v. New Jersey*, 408 U.S. 901, 903, 33 L. Ed. 2d 321, 92 S. Ct. 2479 (1972) (Powell, J., dissenting).

The injunction, however, applies to all use of such words, regardless of whether children are present. Thus, it is drawn more broadly than necessary to achieve the State's interest. As stated in *Stanley v. Georgia*, 394 U.S. 557, 564, 22 L. Ed. 2d 542, 89 S. Ct. 1243 (1969), the "right to receive information and ideas, regardless of their social worth . . . is fundamental to our free society." The injunction cannot water down speech to make it suitable for the sandbox. Accordingly, the injunction must be narrowed.

The record in this case contains medical testimony by one of the respondent physicians that the impact of such language would be most severe on children under the age of 12. Because we are remanding the case on this point, the trial court may wish to take additional medical testimony to determine the appropriate age limit. Furthermore, because it may be difficult to ascertain whether a child is under the identified age, the trial court may wish to provide additional guidelines for determining when picketers should refrain from using the proscribed words. Regardless, the injunction must be narrowed to proscribe the offensive language only when children of the chosen age are present at the picket site.

### B. State Constitution

Share argues that the content restriction in the injunction constitutes a prior restraint, prohibited by Const. art. 1, § 5. In *State v. Coe*, 101 Wn.2d 364, 374, 679 P.2d 353 (1984), the court stated that "the plain language of Const. art. 1, § 5 seems to rule out prior restraints under *any* circumstances, leaving the State with only post–publication sanctions to punish abuse of free speech rights." According to the court, this absolute approach comports with our recent ruling in *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 635 P.2d 108 (1981), that under article 1, section 5, free speech is a "'preferred right' when balanced against other constitutional rights." *Coe*, at 375.

We do not now suggest a retreat from the prior restraint analysis set forth in *Coe*. When faced with a classic prior

restraint, we will strictly interpret our state constitution to favor free speech rights, even if such speech would not be protected by the first amendment to the United States Constitution.

▪▪▪ The content restriction in the permanent injunction in this case, however, is not the classic prior restraint of which we spoke in *Coe.* In *Seattle v. Bittner,* 81 Wn.2d 747, 505 P.2d 126 (1973), this court defined prior restraints as "official restrictions imposed upon speech or other forms of expression in advance of actual publication." *Bittner,* at 756 (quoting Emerson, *The Doctrine of Prior Restraint,* 20 Law & Contemp. Probs. 648 (1955)). In this case, however, the trial court imposed the content restriction *after* actual publication and only to prevent further harm to young children who otherwise would be subject to the harmful effects of the proscribed words. Thus, unlike the order in *Coe,* the content restriction in this case does not "fit neatly within the definition of prior restraints . . ." *Coe,* at 372. The injunction in this case is a post–publication sanction.

Whether speech is regulated before or after publication is crucial under our state's constitution. Under article 1, section 5 of the Washington Constitution, "[e]very person may freely speak . . . being responsible for the abuse of that right." Because the right to speak freely cannot be abused until exercised, before it is exercised there can be no responsibility. Prepublication restraints prohibit exercise of the right before any abuse of the right can be shown, thus imposing responsibility in contravention of the express language of Const. art. 1, § 5. Post–publication restraints, however, simply prohibit further exercise of the right after a showing of abuse. Because an individual is responsible for abuse of the right, a post–publication sanction can be imposed consistent with Const. art. 1, § 5.

In the civil context, post–publication sanctions potentially could take one of two basic forms: (1) an award of damages in a tort action, or (2) an injunctive order prohibiting further dissemination of speech. The latter sanction arguably constitutes a prior restraint to the extent it pro-

hibits speech in advance of further publication. Under this argument, even post–publication injunctions would violate Const. art. 1, § 5 as interpreted by *Coe.*

If this view were accepted, the only remedy available to a person allegedly injured by another's speech would be an award of damages in a civil suit for damages. However, as we said in *Rhinehart v. Seattle Times Co.,* 98 Wn.2d 226, 237, 654 P.2d 673 (1982), *aff'd,* 467 U.S. 20, 81 L. Ed. 2d 17, 104 S. Ct. 2199 (1984),

> [a] tort action should not and does not constitute the sole protection which government affords to the privacy interest of individuals. A threatened invasion of those interests may not have all of the characteristics necessary to warrant recovery of damages under existent tort principles and yet be properly a subject of governmental sanction.

Likewise, a tort action cannot constitute the sole protection of our young citizens in this case. Accordingly, we construe Const. art. 1, § 5 to permit post–publication injunctive relief to a private individual if that relief serves a compelling state interest, and is narrowly drawn to serve that interest.

Applying this analysis to the facts of this case, we conclude that the permanent injunction does not violate Const. art. 1, § 5, except to the extent it bars use of the proscribed words even when children are not present at the picket site. First, we believe Share picketers abused their free speech rights under Const. art. 1, § 5 by employing the proscribed words in the presence of young children in a manner calculated to inflict "verbal shock treatment". Although use of such language arguably furthers the national debate on abortion when directed at adults, the same cannot be said when such language is directed at young children.[8] On the

---

[8]Receipt of this information by young children is irrelevant to the extent it is provided to effect Share's goals. A child's understanding of the abortion issue is not furthered by noneducational epithets of the type proscribed by the injunction. Furthermore, children have very limited access to the political process and cannot be expected to further the aims of Share and other antiabortion groups. Finally, few children of this age can reasonably be expected to visit the Medical Building

other hand, a young child can be expected to suffer physical, emotional and psychological harm by being told that "your doctor murders babies", just before visiting his doctor. The effect of such statements upon the child and his relationship with his doctor constitutes the type of abuse for which responsibility can be imposed consistent with Const. art. 1, § 5.

Second, we believe the State has a compelling interest in preventing the above described abuse through the injunctive process. The parents' right to direct the rearing of their children clearly is deserving of the State's protection. Outside the school setting, the State entrusts the education of a child to members of the family unit and persons of their choosing. Here, at least, parents have a right to determine the manner in which delicate moral issues will be discussed with their young children. Where a third person thrusts his views upon a child against a parent's wishes, in a manner and under circumstances which threaten harm to the child, the State has a compelling interest in intervening, even if intervention limits the third person's right of free speech.

The State also has a compelling interest, independent of the parents' interest, in the exercise of its police power to preserve the sanctity of the doctor–patient relationship and the general health of its young citizens. A child who arrives in his doctor's office upset and fearful of his doctor cannot be expected to respond in a manner which maximizes the doctor's ability to provide needed health care. Where an adult is concerned, such consequences arguably constitute the price we pay for free speech. Where a child is concerned, however, the cost is unacceptable.

Finally, we believe the trial court's content restriction is narrowly drawn to serve the State's interest, except to the extent that it bars use of the proscribed language even when no children are present at the picket site. None of the above defined state interests are served by insulating adults

---

for abortion–related services, and therefore cannot be viewed as requiring any antiabortion counseling, especially of the type proscribed.

from hearing the proscribed language. Accordingly, we remand the case to the trial court to narrow the injunction consistent with this opinion.

## IV
### CONTEMPT ORDERS AND FEE ASSESSMENTS

Contemnors in this case argue that the trial court erred by issuing contempt orders for violation of the permanent injunction on the ground the injunction constituted an unconstitutional prior restraint. The contemnors were not charged with violation of the content restriction, but rather with violation of the place restriction. Because the contempt orders only relate to violation of the place restriction, which we conclude was valid under both the First Amendment and Const. art. 1, § 5, we affirm the trial court's findings of contempt. Furthermore, given the heightened emotional tension surrounding the abortion issue, we approve of the trial court's use of civil contempt sanctions, recognizing the trial court may wish to resort to criminal sanctions in the appropriate case.

Appellants also contend the trial court erred by assessing attorney fees of $7,000 and costs of $1,200 against contemnors Grace Gerl and Teresa Lindley. Statutory authority, however, provides that the aggrieved party in a contempt proceeding may receive judgment from the defendant to satisfy the costs and disbursements incurred as a result of the contempt. RCW 7.20.100.[9] To recover fees, the contempt must be of a lawful order and have been committed willfully. *State ex rel. Lemon v. Coffin,* 52 Wn.2d 894, 898, 327 P.2d 741, 332 P.2d 1096 (1958).

The contempts adjudicated against all the parties,

---

[9]RCW 7.20.100 provides:

"If any loss or injury to a party in an action, suit or proceeding prejudicial to his rights therein, have been caused by the contempt, the court or judicial officer, in addition to the punishment imposed for the contempt, may give judgment that the party aggrieved recover of the defendant a sum of money sufficient to indemnify him, and to satisfy his costs and disbursements, which judgment, and the acceptance of the amount thereof, is a bar to any action, suit or proceeding by the aggrieved party for such loss or injury."

including Ms. Gerl and Ms. Lindley, were based upon their refusal to obey a content–neutral, geographic restriction. Because the place restriction was valid, the contempts triggered the statutory fees provision. Further, the court found the contemnors had knowingly and intentionally violated the geographic restriction. Such violations are "willful" for the purposes of the *Coffin* rule.

The trial court has discretion in determining the propriety of costs and fees under RCW 7.20.100. As we said in *Coffin*, "[i]n all actions and proceedings other than those mentioned in this chapter . . . where no provision is made for the recovery of costs, they may be allowed or not, and if allowed may be apportioned between the parties, in the discretion of the court." *Coffin,* at 898 (quoting RCW 4.84.190). We conclude the trial court did not abuse that discretion. Counsels' supporting affidavits from other attorneys in Spokane establish that the hours and hourly rates were reasonable.

Given the complexity of the issues, the extensive record of Ms. Lindley's and Ms. Gerl's defiance to the lawful order of the trial court, and the reasonable efforts by counsel to comply with the court's request to document noncompliance with its order, the trial court's award of fees in the amount of $7,000 and costs in the amount of $1,200 was neither arbitrary nor capricious. Accordingly, we affirm the trial court's award of attorney fees against contemnors Gerl and Lindley.

Because Share did not substantially prevail on appeal, the request for attorney fees is denied.

DOLLIVER, C.J., UTTER, BRACHTENBACH, and CALLOW, JJ., and CUNNINGHAM, J. Pro Tem., concur.

DOLLIVER, C.J. (concurring specially)—I concur with all aspects of the majority opinion except that portion discussing the place restriction in the trial court's injunction. The majority has gone farther than necessary to uphold the injunction by resorting to the State's interest in protecting

the right of privacy afforded women by the decision of the Supreme Court in *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973). I believe the injunction is supported simply by the State's interest in maintaining access to and from a health care facility. *See Cox v. Louisiana,* 379 U.S. 559, 13 L. Ed. 2d 487, 85 S. Ct. 476 (1965); *Cameron v. Johnson,* 390 U.S. 611, 20 L. Ed. 2d 182, 88 S. Ct. 1335 (1968); *Pickens v. Okolona Mun. Separate Sch. Dist.,* 594 F.2d 433 (5th Cir. 1979); *Concerned Jewish Youth v. McGuire,* 621 F.2d 471 (2d Cir. 1980). I would go no further.

DORE, J. (dissenting)—I would hold that the place and content restrictions in the permanent injunction, ordering the picketers to refrain from picketing directly in front of the medical clinic and enjoining oral use of the words "murder", "kill" and their derivatives, while young children are present, violate federal free speech protections. I would reverse the trial court and dismiss the contempt orders.

### PLACE RESTRICTIONS
In my view the majority has engaged in an unlawful abridgment of appellants' exercise of their First Amendment right to picket and demonstrate in a peaceful and orderly manner. The place restrictions contained in the injunction go far beyond measures that are justifiable as reasonably necessary to maintaining access to and from a health care facility or in protecting a woman's privacy right. The majority, instead of proscribing only activity posing a serious threat to those desiring access to the health care facility and searching for less restrictive alternatives, has chosen the easier course of riding roughshod over the demonstrators' exercise of First Amendment rights in the very place where they are entitled to the most protection—our public sidewalks. It is rather ironic and unfortunate that at a time when the abortion issue is at the forefront of public debate this court places a severe impediment upon those most desirous to have their opinions heard.

We start with certain indisputable propositions of constitutional law. The first of these is that public places, particularly streets and sidewalks, are the normal and natural locations for our citizens' exercise of their First Amendment right of free speech.

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. Committee for Indus. Org.,* 307 U.S. 496, 515, 83 L. Ed. 1423, 59 S. Ct. 954 (1939); *see also Lehman v. Shaker Heights,* 418 U.S. 298, 303, 41 L. Ed. 2d 770, 94 S. Ct. 2714, 2717 (1974); *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981).

While the State may reasonably regulate the time, place and manner of the exercise of First Amendment rights as necessary to protection of other compelling public interests, *Grayned v. Rockford,* 408 U.S. 104, 33 L. Ed. 2d 222, 92 S. Ct. 2294 (1972); *Police Dep't v. Mosley,* 408 U.S. 92, 98, 33 L. Ed. 2d 212, 92 S. Ct. 2286 (1972); *Adderley v. Florida,* 385 U.S. 39, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966); *Cox v. Louisiana,* 379 U.S. 536, 554–55, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965), "time and place" regulations can enormously hinder the individual's ability to engage in effective advocacy. "Access to the 'streets, sidewalks, parks, and other similar public places . . . for the purpose of exercising [First Amendment rights] cannot constitutionally be denied broadly. . . .'" *Grayned,* at 117 (quoting *Amalgamated Food Employees Local 590 v. Logan Vly. Plaza, Inc.,* 391 U.S. 308, 315, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968)). Even when regulation is justified, it must be "narrowly tailored to further the State's legitimate interest." *Grayned,* at 116–17; *Police Dep't,* at 98; *Cox,* at 575–76. Moreover, exercise of First Amendment rights, when logically related to a par-

ticular forum, is further protected from regulations which would preclude the use of that place. *Brown v. Louisiana,* 383 U.S. 131, 15 L. Ed. 2d 637, 86 S. Ct. 719 (1966) (plurality opinion); *Albany Welfare Rights Org. v. Wyman,* 493 F.2d 1319, 1323–24 (2d Cir.), *cert. denied,* 419 U.S. 838 (1974).

In balancing the individual's right to demonstrate against the concern for the protection of others, the competing interests must be assessed on an individual basis; blanket bans and absolute prohibitions against picketing in front of or near a site have been universally condemned where a less restrictive and more clearly tailored alternative may be formulated. As the United States Supreme Court stated in *Police Dep't v. Mosley, supra* at 100–01:

> Predictions about imminent disruption from picketing involve judgments appropriately made on an individualized basis, not by means of broad classifications, especially those based on subject matter.

In short, although limited regulation is permitted, it must be carefully defined and sufficiently circumscribed to minimize the opportunities for abuse of discretion, lest this treasured constitutional right of free speech be subjected to excessive or unnecessary restraints.

The proper discharge of this responsibility is difficult. The court's task would be easier if it had broad discretion to squelch free speech and assembly without the necessity of tailoring any restraints to what is absolutely necessary in each individual case. Unfortunately, such discretion has been exercised in the present instance. The result, unsurprisingly, is an excessive restraint. The majority has placed its concern for protection of one constitutional right above another, and paid scant heed to basic time–honored principles of free speech and expression.

The resulting injunction, as approved by the majority, prohibits picketers from (1) picketing, demonstrating, or "counseling" at the Sixth Avenue Medical Building, except along the public sidewalk north of the bus stop on Stevens Avenue; (2) threatening, assaulting, intimidating or coerc-

ing anyone entering or leaving the Medical Building; (3) interfering with ingress or egress at the building or parking lots to the south and southeast of the premises; (4) trespassing on the premises; (5) engaging in any unlawful activity directed at respondent physicians or their patients; (6) referring, in oral statements while at the picket site, while young children are present, to physicians or patients, staff or clients as "murdering" or "murderers", "killing" or "killers", or to children or babies as being "killed" or "murdered" by anyone in the Medical Building.

The trial court's findings, which purportedly justify these restrictions, are that (1) picketers have positioned themselves on the public sidewalks along Sixth Avenue and at the only walkway to the main entrance; (2) picketers have obstructed the passage of visitors and staff at the Medical Building; (3) picketers have caused the physicians and patients emotional distress, created a substantial risk of physical and mental harm, and forced "counseling" upon persons attempting to enter or leave the premises; (4) picketing has been conducted in an aggressive, disorderly and coercive manner, and in instances has given rise to a clear and present danger to patients; (5) picketing has been conducted in a manner incompatible with the character and function of the Medical Building; and (6) picketers have repeatedly referred to physicians practicing in the Medical Building as killers or murderers in the presence of young children.

Although these findings are supported by the record, the record also clearly demonstrates that such incidents have been isolated and infrequent in occurrence. Restrictions less onerous than complete removal of the picketers from the public sidewalk fronting the health care facility are available to protect the State's interest of assuring access to the facility.

In *Parkmed Co. v. Pro-Life Counselling, Inc.,* 110 Misc. 2d 369, 442 N.Y.S.2d 396 (1981), a New York trial court enjoined antiabortion picketers "from demonstrating, picketing and in any way interfering . . . on the . . . plaza area

and its steps". On appeal, the New York Supreme Court, Appellate Division, struck down this portion of the injunction on the ground that it "was overly broad and unnecessarily restricted peaceful picketing and demonstrating . . ." *Parkmed Co. v. Pro-Life Counselling, Inc.,* 91 A.D.2d 551, 552, 457 N.Y.S.2d 27, 29 (1982). Likewise the injunction at issue is broader than necessary, because it prohibits peaceful, controlled picketing that does not impede ingress or egress. The majority in effect concedes that the restrictions are overly broad in regard to effectuating access to the medical facility.

> With respect to the State's interest in maintaining ingress and egress, the injunction arguably could be narrowed without compromising that interest. The injunction could (1) limit the number of picketers, (2) require them to remain a certain distance from the walkway leading to the entrance, (3) require them to picket in single file, or (4) all of the above. By narrowing the injunction, the State could serve its significant interest in maintaining convenient access to medical care without unduly limiting the picketers' expressive activities.

Majority opinion, at 231.

The majority nonetheless condones this excessive restraint as necessary to mitigate the harassing effect of antiabortion picketers. In so doing, the majority makes a monumental error in its constitutional analysis. The majority perceives that such picketing invades a woman's privacy rights in effectuating the abortion decision. The privacy interest espoused in *Roe v. Wade,* 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), however, deals with a woman's right to make a decision concerning abortion without *governmental* intrusion. *See also Akron v. Akron Ctr. for Reproductive Health, Inc.,* 462 U.S. 416, 76 L. Ed. 2d 687, 103 S. Ct. 2481 (1983). This does not mean that a woman is entitled to make a decision about abortion in a vacuum, free from public comment including the views expressed by picketers. This privacy interest does not extend to isolate a woman from public debate by silencing others.

Moreover, speech does not lose its protected character

simply because it may embarrass others or coerce them into action. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 910, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 29 L. Ed. 2d 1, 91 S. Ct. 1575 (1971). According to the Supreme Court, "[t]here is a 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide–open.'" *Claiborne*, at 913 (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964)). In the words of Justice Rutledge, "'Free trade in ideas' means free trade in the opportunity to persuade to action, not merely to describe facts." *Thomas v. Collins*, 323 U.S. 516, 537, 89 L. Ed. 430, 65 S. Ct. 315 (1945).

The majority seemingly acknowledges the overzealousness of its concern for a woman's privacy interest when it states that

> it is difficult to ascertain what constitutes "harassment" in the apprehensive mind of a woman coming face–to–face with the picketers. By restraining picketing to Stevens Avenue, the court can avoid conjecture on this point, knowing that the woman's right of privacy is protected to the extent permissible under the First Amendment.

Majority opinion, at 231–32.

The ultimate strength of our constitutional guaranties lies in their being unhesitatingly applied in time of controversy and tranquility alike. "If the provisions of the Constitution be not upheld when they pinch as well as when they comfort, they may as well be abandoned." *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 483, 78 L. Ed. 413, 54 S. Ct. 231, 256, 88 A.L.R. 1481 (1934) (Sutherland, J., dissenting). The majority here has affirmed an overly broad injunction which abridges the picketers' First Amendment right of free speech.

For these reasons I would remand this case to the trial court with directions to narrow the injunction by eliminating the place restrictions which prohibit picketers from

picketing, demonstrating, or counseling on the sidewalk fronting the Medical Building. The remaining restrictions in the injunction are sufficient to assure adequate access to the facility.

Because I would hold that the place restrictions are invalid, I would also reverse the contempt orders and fee awards and assessments. These penalties were levied against picketers who violated the place restrictions by picketing along the sidewalk fronting the medical clinic. There was no evidence that these picketers violated any other restrictions in the injunction relating to interfering with ingress or egress to the clinic.

## CONTENT RESTRICTIONS

It is also my view that enjoining oral use of the words "murder", "kill" and their derivatives in the presence of children under an identified age violates First Amendment rights of free speech. Because the injunction restricts the content of speech in advance of actual publication or broadcast, it constitutes a prior restraint. The United States Supreme Court held in *Keefe,* 402 U.S. at 419 that "[a]ny prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 556–59, 49 L. Ed. 2d 683, 96 S. Ct. 2791 (1976). The primary reason for this heavy presumption of invalidity was articulated by the Court in *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 43 L. Ed. 2d 448, 95 S. Ct. 1239 (1975):

> [A] free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

The only basis upon which a prior restraint can be upheld is if the communication restrained is constitutionally unprotected speech such as obscenity, incitement to acts of violence, or speech that directly threatens military

security. *See Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 716, 75 L. Ed. 1357, 51 S. Ct. 625 (1931). The speech restrained by the majority here does not fall within any of these narrow categories.

The only possible unprotected category under which the restrained words in these actions might fall is the category of words identified in *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 86 L. Ed. 1031, 62 S. Ct. 766 (1942) as having "no essential part of any exposition of ideas, . . ." and whose "very utterance inflict injury or tend to incite an immediate breach of the peace."

Contemporary applications of this doctrine prove that it is a very narrow exception to the rule that prior restraints are presumptively unconstitutional. In *Tinker v. Des Moines Indep. Comm'ty Sch. Dist.,* 393 U.S. 503, 508, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969), the Court, overturning a restriction on wearing of armbands in school as a political protest, emphasized that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." Restraint of speech may not be constitutionally justified from a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker,* at 509. *See also NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909–10, 73 L. Ed. 2d 1215, 102 S. Ct. 3409 (1982); *Cohen v. California,* 403 U.S. 15, 29 L. Ed. 2d 284, 91 S. Ct. 1780 (1971).

The evidence fails to demonstrate any incitement to violence or other significant harm to the listeners. Significantly, the words proscribed play an important role in the "exposition of ideas" in the abortion debate. The combination of the absence of significant harm and the importance of the restricted words to the abortion debate dictates that the prior restraint cannot be constitutionally justified. While the majority finds that the doctor–patient relationship may be harmed by the use of such words, and that they may have some "physical and psychological" effect on young children, none of the evidence demonstrates an incitement to violence or a harm that was any greater than

the kind of anger, agitation, embarrassment, and emotional turmoil that is the natural product of debate and the conflict of ideas deemed permissible in the cases discussed above.

Further, the majority's command that the trial court provide guidelines for ascertaining when a child of susceptible age is present is an impossible task. I can conceive of no reasonable means of determining on casual meeting of a child on a sidewalk whether the child is 11 or 12 years of age. A prior restraint cannot be justified on such evidence.

The words "murder", "kill", and their derivatives play an essential role in the debate concerning abortion. To those opposed to abortion, the logical conclusion of that moral position is that abortions result in babies being killed or murdered. If the court were to deprive picketers of the words which most clearly embody the moral position of those picketers, it would eviscerate completely the debate concerning abortion. Just as abortion proponents must be able to articulate their belief that abortion is constitutionally justified as an aspect of a woman's right to procreative freedom, see *Bigelow v. Virginia,* 421 U.S. 809, 44 L. Ed. 2d 600, 95 S. Ct. 2222 (1975), so must abortion opponents be permitted to articulate their belief that abortion should not be permitted because it involves the taking of human life.

There is no question that the use of words such as "kill" and "murder" caused some agitation and emotional turmoil. Such responses are an inevitable part of debate that lies at the very heart of freedom of speech. Those words embody and crystallize the position of antiabortion activists. Deprived of such words, antiabortion activists would be deprived of the right to carry their argument fully to the public. The worth of such words can only be evaluated in the commerce of ideas where they will be judged in relation to opposing arguments and ultimately either accepted or rejected.

In sum, the restrictions on content in the injunction is an unconstitutional prior restraint, and the evidence presented in this case did not establish a narrow exception on the rule

of presumptive unconstitutionality for such restraints.

## CONCLUSION

I would hold that the place and content restrictions in the permanent injunction are violative of picketers' First Amendment rights of free speech. The place restriction is overly broad and unnecessarily prohibits peaceful picketing and demonstrating on the public sidewalk fronting the medical clinic. The content restriction is an unjustified prior restraint which would prohibit use of words which are an inevitable part of debate concerning abortion.

ANDERSEN, J. (dissenting in part)—I disagree with the majority's decision to uphold the place restriction in the trial court's permanent injunction because it seems obvious to me that it is an overbroad restraint of citizens' constitutional rights to publicly express their views.

At issue in this case are the competing rights of those people having opposing views on abortion. On the one side are women who have the legal and constitutional right to obtain abortions, and doctors who have the right to perform them, so long as all concerned comply with this state's abortion laws.[10] On the other side are those who oppose abortion and who have the legal and constitutional right to express their views by peacefully picketing and distributing leaflets in public forums such as the streets and sidewalks of our cities.[11]

On the one hand, the abortion proponents have the right to ignore the opponents' signs and leaflets or to consider them, as they deem fit. On the other hand, the abortion opponents have the right to peacefully and publicly declare their opinions on the subject. The law as we have stated it with regard to labor picketing is equally applicable in the

---

[10]See Roe v. Wade, 410 U.S. 113, 153, 35 L. Ed. 2d 147, 93 S. Ct. 705, reh'g denied, 410 U.S. 959, 35 L. Ed. 2d 694, 93 S. Ct. 1409 (1973); RCW 9.02.060.

[11]See United States v. Grace, 461 U.S. 171, 176, 75 L. Ed. 2d 736, 103 S. Ct. 1702 (1983).

context of abortion picketing:

> Peaceful picketing is an exercise of the right of free speech. Organized labor has the right to communicate its views either by word of mouth or by the use of placards. This is nothing more nor less than a method of persuasion. But when picketing ceases to be used for the purpose of persuasion—just the minute it steps over the line from persuasion to coercion—it loses the protection of the constitutional guaranty of free speech, and a person or persons injured by its acts may apply to a court of equity for relief.

*Swenson v. Seattle Cent. Labor Coun.*, 27 Wn.2d 193, 206, 177 P.2d 873, 170 A.L.R. 1082 (1947), cited in *Gazzam v. Building Serv. Employees Local 262*, 29 Wn.2d 488, 498, 188 P.2d 97, 11 A.L.R.2d 1330 (1947) and *Audubon Homes, Inc. v. Spokane Bldg. & Constr. Trades Coun.*, 49 Wn.2d 145, 151, 298 P.2d 1112 (1956), *cert. denied*, 354 U.S. 942, 1 L. Ed. 2d 1536, 77 S. Ct. 1392 (1957).

The fact that the sidewalk picketing became "aggressive, disorderly, and coercive" (as the trial court described the picketers here) does not justify the court in then proceeding to so restrict the right to picket as to render it totally meaningless. As the United States Supreme Court held in *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515–16, 83 L. Ed. 1423, 59 S. Ct. 954 (1939), the right of citizens to publicly discuss their views on important issues is one which our society holds dear:

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens. The privilege of a citizen of the United States to use the streets and parks for communication of views on national questions may be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience, and in consonance with peace and good order; *but it must not, in the guise of regulation, be abridged or denied.*

(Italics mine.) The majority concedes that "the First Amendment sharply curtails the government's ability to permissibly restrict expressive conduct" in public forums such as streets and sidewalks. Majority, at 222. I believe that the place restriction contained in the trial court's permanent injunction unconstitutionally abridges the protected right of citizens to express their views on abortion, which is undeniably a national issue that has aroused considerable public debate.

As the majority also acknowledges, place restrictions on constitutionally protected expression are valid only if narrowly tailored to serve a significant government interest.[12] The significant interests that the majority cites as justification for the geographical restriction imposed on the picketers are (1) facilitating actual ingress into and access from the Medical Building and (2) reducing the coercive impact of picketing upon patients and staff of the Medical Building.

It is interesting to note that the permanent injunction ordered by the trial court *does* protect both of these interests and does so independently of the place restriction it also imposes. In addition to restricting picketers to the Stevens Avenue location, the injunction properly prohibits the abortion picketers from "interfering with ingress or egress at the building or parking lots to the south or southeast of the premises", from "threatening, assaulting, intimidating or coercing anyone entering or leaving the Medical Building", and from "engaging in any unlawful activity directed at respondent–physicians or their patients." Thus, anyone who violates one of these three provisions of the injunction will be liable for contempt regardless of where around the Medical Building he or she is picketing. That is both appropriate and legal.

The geographical restriction in the injunction, therefore, is surplusage that unnecessarily restrains constitutionally

---

[12]*See Grace,* at 177; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45, 74 L. Ed. 2d 794, 103 S. Ct. 948 (1983).

protected expression. If a place restriction on the antiabortion picketers is needed (in the opinion of the trial court on remand), given the other restrictions contained in the injunction, it should be narrowed from the unduly broad place restraint currently in effect. I agree with the majority at page 231 that the place restriction could be narrowed by (1) limiting the numbers of picketers, (2) requiring them to remain a certain distance away from the walkway leading to the entrance, (3) requiring them to picket in single file, or (4) all of the above. I depart from the majority because I would hold that the remand to the trial court should include instructions to that court to narrow the injunction's place restriction placed upon the antiabortion picketers. In my view, when the trial court limited picketing to a location around the corner and down the block from the entrance to the building, it left no alternative channel of communication open to the picketers and, as a consequence, the place restriction was overly broad and unnecessarily restrictive.[13] The injunction could accord the same protections to the patrons of the clinic and their doctors without resorting to that.

For the foregoing reasons, I respectfully dissent from only that part of the majority's opinion which upholds the place restrictions in the trial court's injunction, and from the contempt convictions based thereon.

GOODLOE, J. (dissenting)—I am in complete agreement with Justice Andersen's dissent. I write separately only to note that if, on remand, a narrower place restriction is imposed that such restriction should state specifically where the picketers may not be. Any injunction which states only where the picketers shall be is necessarily too broad and logically precludes them from being anyplace else.

---

[13]*Parkmed Co. v. Pro-Life Counselling, Inc.*, 91 A.D.2d 551, 552, 457 N.Y.S.2d 27, 29 (1982).