IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Marriage of | ) | No. 69260-7-I |
| HANNA GOMAA, | ) | |
| | ) | DIVISION ONE |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| ABDELKRIM (A.K.) ZEBDI, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 3, 2014 |

SCHINDLER, J. — Abdelkrim (A.K.) Zebdi appeals the decree of dissolution, the findings of fact and conclusions of law, the final parenting plan, and the final order of child support. Zebdi asserts the court erred in (1) awarding $16,000 to his former spouse Hanaa Gomaa for the sale of a car, (2) failing to take into consideration cultural factors and finding he committed acts of domestic violence, and (3) ordering him to pay $30,000 in attorney fees under RCW 26.09.140 and CR 11. We affirm the trial court in all respects.

FACTS

Abdelkrim (A.K.) Zebdi was born and raised in Djelfa, Algeria. Zebdi obtained a degree in biology and attended graduate school in Algiers. In 1989, Zebdi moved to Alaska to attend the University of Alaska Fairbanks and obtain a master's degree in

fisheries. In 1992, Zebdi moved to Michigan to work on a research project at Michigan State University.

Hanaa Gomaa was born and raised in Cairo, Egypt, and graduated from American University. In 1988, Gomaa moved to the United States to attend Michigan State University and obtain a graduate degree in school psychology.

Zebdi and Gomaa began dating in 1993 and on November 22, 1994, got married in Michigan. In 1996, their son M.L.Z. was born. Two years later, another son A.R.Z. was born. After the birth of A.R.Z., Zebdi obtained a master's degree in statistics and started working as a computer programmer. In 1998, Gomaa received a doctorate in school psychology.

In 2000, Zebdi got a job with a Seattle software company, Insightful Corporation, and the family relocated to Washington. Gomaa stayed home to take care of the children and assumed responsibility for homeschooling. In 2007, their daughter M.G.Z. was born. That same year, Zebdi started his own computer consulting business, Ghalia Technology LLC, and continued to work at AllRecipes.com. From 2007 to 2008, Zebdi worked at "WTS," and in 2008, he went to work for the Pacific States Marine Fisheries Commission as a computer programmer.

In February 2011, Gomaa and the three children visited her family in Egypt. While in Egypt, Zebdi told Gomaa to send him divorce papers. Zebdi also asked Gomaa to send passport photos of the children but would not tell her why. In July, Gomaa left Egypt and returned to Michigan with the children. Gomaa did not tell Zebdi she was leaving Egypt or returning to Michigan because she was afraid he would take the children away.

On August 19, Gomaa filed a petition for dissolution of the marriage in King County Superior Court. Zebdi filed a motion for an order requiring Gomaa to return the children to Washington and for a temporary restraining order preventing both parties from selling or disposing of property. Gomaa filed a motion for an order prohibiting Zebdi from moving the children from Michigan to Washington. In support, Gomaa stated that Zebdi physically abused her and the two boys, M.L.Z. and A.R.Z., and attached a photograph showing bruising on A.R.Z.'s face. Zebdi filed a declaration denying abuse.

The court granted Zebdi's motion for a temporary restraining order and on September 14, entered an order prohibiting the parties from "transferring, removing, encumbering, concealing or in any way disposing of any property." The court denied Zebdi's motion to order the return of the children to Washington. The court appointed a guardian ad litem (GAL) to investigate and report to the court on:

> A) [C]ultural issues impacting parenting; B) whether the children would be at risk in the father's residence; and C) make a recommendation to the Court for the children's temporary Residential Placement pending trial.

Gomaa filed a motion for temporary maintenance of $1,000 a month, child support, and entry of a temporary restraining order to prevent both parties from also "selling, harming, transferring, removing, encumbering, concealing or in any way disposing of any property," including withdrawing any money from bank accounts. The court denied the request for maintenance but ordered Zebdi to pay child support. The court granted Gomaa's motion and entered a temporary restraining order on October 6 that prohibited the parties not only from selling, transferring, or concealing property, but

also prohibited the parties from withdrawing "any monies from checking accounts[,] . . . savings accounts or money market accounts."

On March 22, 2012, the GAL filed a 35-page report with the court. The GAL interviewed Gomaa, M.L.Z., A.R.Z., Zebdi, and people who knew the family.[1]

According to the report, Zebdi told the GAL that the marriage had its " 'ups and downs.' " Zebdi told the GAL that when M.L.Z. was born he " 'felt nailed' " because he could no longer be a " 'free spirit.' " Zebdi said that when A.R.Z. was born, " 'the second foot was nailed.' " Except for throwing a slipper " 'in her direction' " on two occasions, Zebdi told the GAL he did not abuse Gomaa. Zebdi also denied abusing M.L.Z. or A.R.Z., stating that he only used " 'mild, non-harming, corporal reminders and only if absolutely necessary.' " Zebdi explained to the GAL that the physical " 'reminders' " were part of the " 'seven years of training' " phase in the traditional child-rearing schedule he followed.

Fifteen-year-old M.L.Z. told the GAL that his father had " 'mood swings' " and that he was not sure Zebdi could control his emotions. M.L.Z. said that his father was physical with him " 'a lot of times.' " Zebdi would slap "really hard" and that his slaps were "the injuring kind. They were not meant to have lasting damage but temporary pain." Once Zebdi slapped M.L.Z. several times in a row when he was "on the ground" and then "kicked me in the torso a couple of times. He kicked me to hurt me" and " 'made me feel worthless.' "

---

[1] In the report, the GAL explained that she did not interview Zebdi's friends who wrote declarations on his behalf because these individuals did not observe Zebdi's interactions with the family in private.

4

Thirteen-year-old A.R.Z. told the GAL that Zebdi " 'slapped me and my brother plenty of times, in the face.' " A.R.Z. recalled that once, Zebdi " 'hit me in the head with a three inch math book.' " A.R.Z. said that Zebdi had a long cane with a rubber tip and would " 'sit[ ] about the length of the cane away and hit[ ] my brother on the head with it.' " Both M.L.Z. and A.R.Z. said they observed Zebdi yell at Gomaa but only A.R.Z. reported witnessing physical abuse. A.R.Z. said he saw Zebdi hit Gomaa when she was carrying M.G.Z. and that Gomaa had fallen to the ground.

The GAL concluded that "domestic violence did occur in the Zebdi home" against Gomaa, M.L.Z., and A.R.Z. The GAL recommended that the children stay in Michigan with Gomaa and that Zebdi enter a domestic violence treatment program.

The trial began on July 23, 2012. Although the parties had few assets, Gomaa and Zebdi disagreed about the nature and extent of their assets, and Zebdi denied committing acts of domestic violence. Gomaa, Zebdi, the GAL, and several other witnesses testified during the four-day trial.

Gomaa testified that during the marriage, she did not have a separate bank account and did not have access to Zebdi's personal bank account. Gomaa said that she owned an apartment in Egypt that generated approximately $200 a month in rental income, and she sporadically received some income from land her family owned. Gomaa testified that she was currently working as a kindergarten teacher in Michigan.

Gomaa testified that Zebdi's anger and abuse escalated during the marriage. Gomaa said Zebdi would throw objects at her, push her, and slap her. Gomaa said that one time when she was talking to her family on the phone, Zebdi pulled her out of the room by her hair, and then shoved and kicked her. Gomaa said on another occasion,

5

Zebdi was upset because M.G.Z. was crying and yelled at Gomaa, slapped her, and then grabbed her by the hair and shoved her onto the mattress while she was holding M.G.Z.

Gomaa's brother Omar Alim testified that while talking to Gomaa on the phone, he heard Zebdi shouting and heard his sister scream, "[D]on't do this, don't do this."

The court admitted the GAL report and Gomaa's contemporaneous diary entries into evidence. The diary entries describe the abuse that took place over the course of several years. The court also admitted an assessment by a social worker in 2007 documenting the abuse, and e-mails between Gomaa and a domestic violence advocate at the Mountlake Terrace Police Department in 2010.

Zebdi testified. Zebdi admitted selling the Honda Odyssey on September 21, 2011 for $16,000. Zebdi also admitted that in December 2010, he had over $40,000 in a personal bank account. But Zebdi said that half of the money was borrowed from friends and he used $10,000 for Gomaa and the children to go to Egypt. Zebdi told the court that prior to the start of trial, he was fired from his job with the Pacific State Marine Fisheries Commission. Zebdi said he did not know if he was eligible for unemployment or, if eligible, what amount he would receive.

Zebdi testified that he never abused Gomaa. Zebdi admitted throwing "a slipper at her once," and conceded that he may have pulled Gomaa's hair inadvertently when it became "caught up, below my pillow" in the bed. Zebdi also admitted that he once put his hand on Gomaa's chin and pushed her face to the side and that she "fell on the bed," but denied shoving her while she was holding M.G.Z.

Zebdi also denied committing acts of domestic violence against M.L.Z. or A.R.Z. Zebdi testified that he physically disciplined his sons as part of his "[t]radition" to teach his children good behavior. Zebdi described the three phases of raising children: seven years of "play," seven years of "training," and seven years of "friendship." During the "training years," Zebdi said he would "physically correct" M.L.Z. and A.R.Z. to "impress their mind" when they did something wrong or when they failed to follow his instructions. The "physical correction[s]" included "bang[ing]" his sons on the head with the rubber-ball-tipped end of a cane; a slap on "[t]he back, the shoulder, sometimes the back of the head"; or a kick "with the flat of [his] foot." Zebdi denied ever hitting his sons hard enough to leave a mark but admitted the boys would sometimes cry when he hit them. Zebdi testified that because both of his sons were now out of "the training phase," he would no longer physically correct them. Zebdi said he never hit M.G.Z. because "there's no physical punishment for girls."

A number of witnesses testified that Zebdi was an excellent father and that they never saw him lose his temper. Uzma Haroon testified that she and her husband knew Zebdi and Gomaa through the mosque, that she was friends with Gomaa, and that Gomaa "never criticized" Zebdi and would "praise" him for being a good father. The other witnesses admitted they did not observe the family at home and had little if any interaction with Gomaa.

The court awarded Gomaa $16,000 for the sale of the Honda Odyssey. The court found that "there was domestic violence involving [Gomaa] and two older children in the home by [Zebdi]." The court entered the decree of dissolution, the final order of child support, extensive findings of fact and conclusions of law, and a final parenting

plan. The parenting plan limits Zebdi's residential time with the children and eliminates mutual decision making. The parenting plan allows the children to reside in Michigan and requires Zebdi to complete at least six months of domestic violence treatment before he may resume visitation with M.L.Z., A.R.Z., and M.G.Z. The court awarded Gomaa $15,000 in attorney fees based on financial need under RCW 26.09.140 and $15,000 in attorney fees based on Zebdi's intransigence under CR 11.

## ANALYSIS

Zebdi argues the trial court erred in (1) awarding $16,000 to Gomaa for the sale of the Honda Odyssey in violation of the October 6, 2011 temporary restraining order; (2) failing to consider cultural factors and finding Zebdi committed acts of domestic violence against Gomaa, M.L.Z., and A.R.Z.; and (3) ordering Zebdi to pay $30,000 in attorney fees.

We review the court's findings of fact for substantial evidence. In re Marriage of Skarbek, 100 Wn. App. 444, 447, 997 P.2d 447 (2000). "Substantial evidence exists if the record contains evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." Bering v. Share, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). Where the trial court has weighed the evidence, the reviewing court's role is simply to determine whether substantial evidence supports the findings of fact and, if so, whether the findings in turn support the trial court's conclusions of law. In re Marriage of Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

We defer to the trier of fact on issues of conflicting testimony and the credibility of witnesses. In re Marriage of Burrill, 113 Wn. App. 863, 868, 56 P.3d 993 (2002). A

court should "not substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility." Greene, 97 Wn. App. at 714.

### 1. Award of $16,000 for Sale of Honda Odyssey

Zebdi contends the court abused its discretion by awarding $16,000 to Gomaa for the sale of the Honda Odyssey. A court has "broad discretion" to make a just and equitable property distribution. In re Marriage of Rockwell, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). This court will reverse only upon a showing of a manifest abuse of discretion. In re Marriage of Buchanan, 150 Wn. App. 730, 735, 207 P.3d 478 (2009).

The court awarded Gomaa $16,000 from the sale of the Honda Odyssey to provide her with "additional necessary resources." The court also found that sale of the car violated the temporary restraining order. The findings of fact state, in pertinent part:

> The Court finds that the most fair and equitable ruling on the Wife's request for maintenance is to confirm that the Wife has a need for maintenance which will likely last for the next two years, and that the Husband's present inability to pay maintenance is temporary. The court, therefore, has made a disproportionate allocation of the proceeds of the sale of the Honda Odyssey ($16,000 to Wife) in order to provide additional necessary resources that but for the Father's recent loss of employment would otherwise have been imposed as two years of monthly maintenance.
>  . . . .
>  . . . The Husband also sold the Wife's car on September 21, 2011 for $16,000, contrary to Temporary Order dated [sic] restraining the sale or disposition of assets.

The decree of dissolution states, in pertinent part:

> Judgment against Husband for his sale of the 2006 Honda Odyssey for $16,000 on or about September 21, 2011, in violation of the Court's Temporary Order dated October 6, 2011.

Zebdi does not challenge the court's decision to award Gomaa the $16,000 as a just and equitable distribution of property. Zebdi argues the court erred in entering judgment against him for $16,000 on the grounds that the sale of the Honda Odyssey violated the October 6, 2011 temporary restraining order.

While the citation to the October 6 temporary restraining order was erroneous, there is no dispute that the sale of the Honda Odyssey violated the terms of the September 14 temporary restraining order. The court entered a temporary restraining order on September 14, 2011 that prohibited the parties from "transferring, removing, encumbering, concealing or in any way disposing of any property." On October 6, the court entered another temporary restraining order prohibiting the parties from "selling, harming, transferring, removing, encumbering, concealing or in any way disposing of any property." There is no dispute that Zebdi then sold the Honda Odyssey on September 21, 2011 for $16,000. The reference to the October 6 temporary restraining order is harmless. Skagit County Pub. Hosp. Dist. No. 1 v. Dep't of Revenue, 158 Wn. App. 426, 449, 242 P.3d 909 (2010).

## 2. Domestic Violence

Zebdi contends the court erred in finding that he committed acts of domestic violence against Gomaa and the two boys.[2] Zebdi assigns error to the following findings and conclusions:

> The Court finds that the Wife has been the victim of domestic violence from the Husband throughout this marriage, including physical violence, verbal and emotional abuse. (Ex. [(Exhibit)] 9, Ex. 17).
> . . . .

---

[2] RCW 26.50.010(1)(a) defines "domestic violence" as "[p]hysical harm, bodily injury, assault, or the infliction of fear of imminent physical harm, bodily injury or assault, between family or household members." A parent's disciplining of a child through physical means can rise to the level of domestic violence. See, e.g., Mansour v. Mansour, 126 Wn. App. 1, 9, 106 P.3d 768 (2004).

This Court finds that there was domestic violence involving the Wife and two older children in the home by the Respondent. Respondent's witnesses did not have an opportunity to observe how Respondent treated his family alone in their home. Respondent's repeated denial that any physical contact occurred, reflected in his pleadings and in his interviews with the Guardian ad Litem, and his later explanation of some of the contacts during his testimony, give credence to the statements by the Wife and two older children, that have not changed throughout this litigation.

Substantial evidence supports the court's finding that Zebdi committed acts of domestic violence against Gomaa, M.L.Z., and A.R.Z. Gomaa testified that Zebdi physically and emotionally abused her. Gomaa's contemporaneous diary entries, Exhibit 9, also document the abuse, and her declaration in response to Zebdi's motion to return the children to Washington, Exhibit 17, corroborated her testimony. In addition, the social work assessment from 2007 and e-mails between Gomaa and a domestic violence advocate corroborated the abuse. The testimony also established that Gomaa disclosed the abuse to friends and family.

Zebdi claims the evidence does not support finding that he committed acts of domestic violence against M.L.Z. and A.R.Z. because the court did not "sufficiently consider the perceived offending acts in light of Islamic culture when making its determination." The record does not support Zebdi's argument.

Cultural factors are proper for the court to consider in making parenting plan decisions. See In re Marriage of Mahalingam, 21 Wn. App. 228, 232, 584 P.2d 971 (1978). Nonetheless, while "some cultures tolerate domestic violence to a greater degree than others," a family living in this state is "subject to the jurisdiction of Washington courts and the laws of Washington under which domestic violence is not tolerated." In re Dependency of A.A., 105 Wn. App. 604, 610, 20 P.3d 492 (2001).

The record also does not support the argument that the court did not take into consideration cultural factors. The court specifically instructed the GAL to investigate "cultural issues impacting parenting" and the GAL report reflects consideration of cultural factors. The report states, in pertinent part:

> In families who come from other cultures, it is important to understand how their actions can be viewed against that culture and what is unique to their family culture. In assessing whether there was domestic violence in this family, it was important to understand their point of view and what they had agreed on.

During trial, the court repeatedly sought clarification from Zebdi and Gomaa about their culture and the use of physical discipline. The court also questioned several witnesses about the three phases for raising children that Zebdi described, and whether physical discipline was a part of Islamic cultural or religious tradition. Each of the witnesses testified that physical discipline of children was not a part of the Islamic religion. For example, the court asked one witness whether there is "any connection to Islam with regard to those three phases?" The witness told the court there was not and indicated physical punishment was not a "normal way of reprimanding" children during the "training phase." Another witness also testified that physical discipline was not a part of the training phase, telling the court, "Islamically, no, it's not supposed to be."[3]

Further, the court's oral ruling expressly addressed cultural factors:

> [U]ndoubtedly, cultural issues play a role here, but even acknowledging that reality, there are several things I can conclude from the evidence. Mr. Zebdi has undeniably touched his wife and his sons in ways that were offensive to them. Although Mr. Zebdi wishes to have his actions viewed as having been done with good intentions, the truth is that his actions were not solely driven by pure motives.

---

[3] Two other friends of Zebdi testified that physical discipline was not a part of either Islam or North African parenting. Soufiane Zeghmi, whose parents were from Algeria, testified that North African parenting style is a "little more strict" compared to the American style, but that he "admired" Zebdi's parenting style precisely because he did not see any physical abuse.

. . . .

So, for all of these reasons, I find that Mr. Zebdi has engaged in domestic violence with both the boys and Ms. Gomaa. I find that his protestations to the contrary are not credible under the circumstances.

Because substantial evidence supports finding Zebdi committed acts of domestic violence, the court did not err by imposing the parenting plan restrictions.

Where the court finds that a parent has engaged in domestic violence, the statute requires limitations on residential time and prohibits mutual decision making as part of the parenting plan. RCW 26.09.191(1)(c) and (2)(a)(iii). "[A]ny limitations or restrictions imposed must be reasonably calculated to address the identified harm." In re Marriage of Katare, 125 Wn. App. 813, 826, 105 P.3d 44 (2004). Here, the restrictions were reasonably calculated to address the identified harm of domestic violence.

### 3. Attorney Fee Award

Zebdi contends the court erred in ordering him to pay $15,000 in attorney fees under RCW 26.09.140. Zebdi contends that because he did not have the ability to pay at the time of trial, the court erred in awarding Gomaa $15,000 under RCW 26.09.140. Under RCW 26.09.140, the court must balance the requesting party's needs against the other party's ability to pay. In re Marriage of Rideout, 150 Wn.2d 337, 357-58, 77 P.3d 1174 (2003).

An appellate court reviews a trial court's award of attorney fees for abuse of discretion. Kruger v. Kruger, 37 Wn. App. 329, 333, 679 P.2d 961 (1984). The party challenging the award has the burden to prove the trial court abused its discretion by making a decision that is clearly untenable or manifestly unreasonable. In re Marriage of Mattson, 95 Wn. App. 592, 604, 976 P.2d 157 (1999). The record shows the court balanced need against ability to pay.

Gomaa had not worked outside the home during the marriage. At the time of trial, Gomaa had been employed as a teacher in Michigan with an annual salary of $23,750. While Gomaa had a doctorate degree, the court found that her present financial situation was "unlikely to improve in the next two years due to her child-rearing responsibilities, lack of work history and licensing credentials." Based on her financial declarations, the court found that Gomaa and the three children had "extremely modest present living expenses of $2,719 per month" with an anticipated monthly gross income of only "$1,979.16, plus net rental income of $183.33." The court also found that Gomaa had incurred attorney fees in the amount of $58,165.94 and out-of-pocket costs in the amount of $5,365.06.

In terms of Zebdi's ability to pay, the court found, in pertinent part:

At the present time, based upon [Zebdi's] testimony and his recent bank statements, it cannot be shown by reliable objective evidence that he has any significant assets from which attorney fees could be paid to [Gomaa] at the end of trial. However, he did appear to have more assets available to him at the time the case was commenced, and an attorney fee award based upon each party's financial resources at the time of the commencement of the case is appropriate in this situation.

Because Zebdi had a "lengthy" 20-year work history and owned his own company, the court found his "present unemployment is a temporary condition that will most likely be rectified in the foreseeable future." The court also found that Zebdi had significant assets in his personal bank account at the time the case was filed and owned "his own IT business, Ghalia Enterprises, LLC[,] . . . from which he has received some income." The court imputed income to Zebdi based on the State tables and the child support worksheet Zebdi submitted to the court.

The case Zebdi relies on, In re Marriage of Steadman, 63 Wn. App. 523, 821 P.2d 59 (1991), does not support his argument that the court abused its discretion in awarding fees under RCW 26.09.140. In Steadman, the court awarded attorney fees without making any findings as to the ability to pay. Steadman, 63 Wn. App. at 529. On appeal, we reversed and held that "[t]he trial court erred in not evaluating [the spouse]'s ability to pay, particularly in view of the substantial tax liabilities imposed on him and the minimal assets awarded to him." Steadman, 63 Wn. App. at 530.

Because substantial evidence supports the trial court's finding that Zebdi had the ability to pay, the court did not abuse its discretion in awarding Gomaa $15,000 in attorney fees under RCW 26.09.140.

Zebdi also contends the trial court erred in awarding $15,000 in attorney fees under CR 11. The determination of a violation of CR 11 is within the sound discretion of the trial court; however, the court must create an adequate record for review by identifying the sanctionable conduct and explaining its reasons for imposing sanctions. Biggs v. Vail, 124 Wn.2d 193, 197, 201, 876 P.2d 448 (1994). "Awards of attorney fees based upon the intransigence of one party have been granted when the party engaged in 'foot-dragging' and 'obstruction,' . . . or simply when one party made the trial unduly difficult and increased legal costs by his or her actions." In re Marriage of Greenlee, 65 Wn. App. 703, 708, 829 P.2d 1120 (1992) (quoting Eide v. Eide, 1 Wn. App. 440, 445, 462 P.2d 562 (1969)).

Zebdi contends the court relied on the assertions in the declaration submitted by Gomaa's attorney stating that "in her opinion, the Wife's attorney fees were increased

75% over what should have been necessary" as a result of Zebdi's intransigence.[4]

Zebdi also argues the court "recited" the CR 11 factors but did not enter findings with respect to the CR 11 factors.

The court did not rely only on the declaration of Gomaa's attorney in finding Zebdi intransigent and awarding fees under CR 11. In its written findings of fact and conclusions of law addressing intransigence, the court cites to the failure to respond to discovery requests, the failure to comply with subpoenas, and the failure to comply with court orders:

> [T]he Petitioner's attorney fees were substantially increased by the Respondent's recalcitrance. He continued to accuse the Wife of the crime of kidnapping throughout the litigation, although the Court had issued an order that she and the children could remain in Michigan. The Husband filed repeated motions to have the GAL discharged. He refused to sign the Confirmation of Issues thereby causing Petitioner's attorney to appear before the Court (and Respondent, who was representing himself at the time, did not appear). Respondent failed to provide timely answers to his interrogatories (Ex. 34) which caused Petitioner's counsel to have to search public records (Ex. 41), subpoena employment records from his employer (Ex. 35), and subpoena bank records (Ex. 37, 40).

The court also found that Zebdi withheld information about financial assets, including approximately $40,000 in his personal bank account, the $10,000 he borrowed from friends around the time the dissolution action was commenced, the $16,000 in proceeds from the sale of the Honda Odyssey, and the income he earned from his

---

[4] The challenged finding states:

The Wife's attorney has stated in her fee declaration that in her opinion, the Wife's attorney fees were increased 75% over what should have been necessary in this case, as a direct result of the Husband's intransigence, as evidenced by his argumentative communications (Ex. 8, 26, 27), multiple attempts to disqualify the Guardian ad Litem, refusal to execute the Confirmation of Issues, noting hearings after counsel had given notice of unavailability, refusal to timely respond to the Wife's Interrogatories and Requests for Production, and failure to fully respond to all of the requests therein, etc. (Ex. 34).

business. Substantial evidence supports the trial court's finding of intransigence and ordering Zebdi to pay $15,000 in attorney fees to Gomaa under CR 11.

We affirm.[5]

WE CONCUR:

---

[5] Gomaa requests attorney fees on appeal. We decline to award attorney fees under RAP 18.9(a) or RCW 26.09.140.

17