# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION  II

| | |
|---|---|
| In the Matter of the Welfare of | No.  49710-7-II |
| D.M.M. | |
| K.M., | |
| Appellant, | |
| v. | |
| DEPARTMENT OF SOCIAL AND HEALTH SERVICES, | UNPUBLISHED OPINION |
| Respondent. | |

JOHANSON, J. — KM appeals the juvenile court's order terminating her parental rights to DMM.  KM argues that her right to due process was violated in two ways.  First, she argues that she received inadequate notice of the termination fact finding that was set on a "trailing" calendar.[1] Second, she argues that she was denied her right to testify when she appeared and requested to

---

[1] "Trailing" is a term used in some courts when a set trial will start as soon as a judge and courtroom becomes available.  This appears to be the term some courts use when proceeding under CR 40(a)(3).  This civil rule provides, "*Adjournments*.  When a case has once been placed upon either docket of the court, if not tried or argued at the time for which notice was given, it need not be noticed for a subsequent session or day, *but shall remain upon the docket from session to session or from law day to law day until final disposition* or stricken off by the court."  CR 40(a)(3) (emphasis added).

testify after the fact finding had ended. KM additionally argues that the Department of Social and Health Services (DSHS) failed to prove that she was offered or provided all necessary services capable of correcting her parenting deficiencies. We hold that the juvenile court did not violate KM's due process rights to adequate notice and opportunity to be heard and that the juvenile court properly found that the DSHS offered or provided all necessary services. Accordingly, we affirm.

FACTS

I. DEPENDENCY

A. BACKGROUND

KM is the mother of DMM, a girl born in September 2014.[2] DMM tested positive for narcotic pain medication at birth.[3] After DMM's birth, the University of Washington Medical Center contacted Child Protective Services (CPS) and reported that KM had been homeless on and off during her pregnancy. KM told the medical center that she would be staying with a friend in Bonney Lake once she was discharged, but KM did not provide a name or number for that friend. The hospital placed a hold on DMM until CPS could investigate further.

KM was previously involved in dependencies with her four older children due to physical abuse of the children, domestic violence, possible sexual abuse, and chemical dependency issues. KM did not complete her services during the prior dependencies, and her rights to her four older children were terminated in February 2013.

_____

[2] DMM's alleged father is deceased. KMM's unknown biological father's rights were terminated on November 4, 2016.

[3] KM is prescribed an opiate medication. KM is human immunodeficiency virus (HIV) positive and suffers from arthritis as a result of her condition.

### B. KM's Court-Ordered Services and Participation

DMM was declared a dependent child on November 14, 2014, and a dispositional order was entered the same day. At the time dependency was established, KM was ordered to complete the following services: (1) random urinalysis (UA) testing, (2) drug/alcohol evaluation and comply with any treatment recommendations, and (3) a psychological evaluation with a parenting assessment and follow treatment recommendations. KM was later ordered to participate in mental health therapy as referred by the DSHS, parenting classes/coaching-Promoting First Relationships (PFR), individual counseling, a domestic violence (DV) survivors group, intensive outpatient treatment, and individual counseling.

In the beginning of the dependency, KM asked the DSHS to refer her to grief counseling. The DSHS referred KM to Good Samaritan Behavioral Health in Puyallup, but never received verification that she attended.

On December 1, 2014, KM was referred for a psychological evaluation. KM missed her first scheduled appointment for her psychological evaluation. On May 4, 2015, KM completed a psychological evaluation with James Manley, Ph.D. Dr. Manley diagnosed KM with posttraumatic stress disorder (PTSD), chronic; rule out: obsessive compulsive disorder; and adjustment disorder with depression. Based on his evaluation of KM, Dr. Manley recommended that KM participate in the following services: parent education, hands-on parent coaching, visits, individual counseling, and DV therapy, specifically a DV survivors group.

KM was first referred to PFR in September 2015, but the referral had to be returned due to KM's inability to make it to her visits. Another referral was made for PFR in December 2015. KM completed four lessons of PFR during that referral. The referral was cancelled again due to

KM missing visits. Another referral was made for PFR in April 2016, but the service was ultimately cancelled because KM did not make it to her visits. KM did not complete PFR.

In August 2016, KM was referred to the Triple P parenting class. KM completed one session of Triple P, but was dropped from the service when her last visit referral was closed due to lack of attendance. KM was originally referred to the Incredible Years toddler class, but she did not complete the class and asked for a different service.

On November 20, 2014, KM was referred to Pioneer Human Services for a drug and alcohol assessment. KM missed her first appointment on December 3, 2014, and missed her next appointment on March 29, 2015. KM was then provided with the information for walk-in appointments. KM completed a drug and alcohol assessment with Pioneer Human Services on May 28, 2015.

The evaluation stated that KM reported that she did not use and did not have a problem with alcohol or drugs. The evaluation noted that KM was currently using medical marijuana, fentanyl 100MCG/HR Patch, hydromorphone 4 mg., and fentanyl 75mcg/h. The evaluator believed that KM was misusing her fentanyl patches because she stated that she used them for anxiety and PTSD. No medical problems were documented in KM's evaluation. The evaluator diagnosed KM with substance moderate/severe use. The evaluator recommended that KM participate in intensive outpatient services, individual counseling sessions, continuous total abstinence from alcohol and other addictive drugs, and follow all treatment recommendations deemed necessary by the clinician.

The DSHS referred KM to Pioneer Human Services for intensive outpatient treatment, but KM was unwilling to participate in treatment and wanted a second opinion.[4] KM completed a second drug and alcohol evaluation that was not DSHS approved. She also completed a four-hour drug and alcohol awareness class as part of the independent chemical dependency evaluation.

In February and March 2016, KM attended a total of four individual counseling sessions. In May 2016, KM's individual counselor reported to the DSHS that she had not seen KM that month.

KM was referred for twice-a-month random UAs throughout the dependency. KM frequently missed her UAs. KM failed to appear for UAs on February 1, 2016, March 30, 2016, April 1, 2016, July 28, 2016, and August 4, 2016. Some of KM's completed UAs were consistent with her prescribed medications and some UAs were not.

KM was also referred to the Young Women's Christian Association for a DV support group and provided with the group facilitator's contact information. KM never reported to the DSHS that she completed the service.

C. HOUSING AND CONTACT WITH DSHS

Throughout the dependency, KM provided several different physical addresses, usually updating the assigned social worker with her new address, if she had one, when she moved. KM also experienced homelessness during the dependency. KM was not offered housing assistance.

---

[4] On September 9, 2015, the juvenile court ordered that it would not order a new drug and alcohol assessment unless the provider had been shown to be incompetent. The juvenile court stated that KM could seek out her own independent evaluation if she so chose, at her own expense.

KM informed the assigned social worker that she had trouble with transportation. In response, the assigned social worker provided KM with bus passes and an ORCA card.

Throughout the dependency, KM's contact with the DSHS was sporadic. KM often did not respond to phone calls or e-mails and did not attend meetings and court hearings regularly. At times, KM would go months without contacting the social worker assigned to the case or her service providers and there were times she would not visit for a month or two. KM had a consistent phone number throughout the dependency, however her phone often did not have minutes and was not accepting phone calls. KM informed the DSHS and other parties involved in the dependency that e-mail was her preferred method of communication. However, there were times that KM was locked out of her e-mail. KM generally e-mailed the assigned social worker when she needed something.

On September 20, 2016, KM received an offer of employment from Dollar Tree.

## II.  TERMINATION FACT FINDING

### A.  TRAILING CALENDAR, NOTICE, AND KM'S NONAPPEARANCE

On October 22, 2015, a petition for termination was filed. September 21, 2016 was the original fact-finding date. Here, KM received written notice of the original fact-finding date through her attorney. The juvenile court held a hearing that day, but no courtrooms were available for the fact finding to begin. The juvenile court informed the parties, "That's why we're talking trailing. And there isn't -- I don't know what the prospects there are of one in the next day or so. That's completely uncertain." Report of Proceedings (RP) (Sept. 21, 2016) at 5. At the beginning of the hearing, KM's attorney informed the court that KM had called and was on her way. The

court instructed KM's attorney to wait for KM to arrive and to check in with the court clerk to see when a courtroom would be available.

When KM arrived for the fact finding on Wednesday, September 21, her attorney told her to stay by her phone so she could learn when the fact finding was supposed to start. KM contacted her attorney the next day, Thursday, September 22, and learned that the fact finding had not yet been assigned a start date and time. KM also contacted her attorney Friday, September 23, and learned that the fact finding was still not set to start. This was the last day that KM contacted her attorney until after the fact finding occurred.

On September 26 to 28, and October 3, the termination fact finding was held in blocks of two to three hours per day. On Monday, September 26, KM's attorney received a phone call at 9:10 AM and was told to be at the court by 9:30 AM to start the fact finding. When the fact finding convened, KM's attorney informed the juvenile court that KM was not present at that time, but that KM had been calling every day asking about the fact finding. KM's attorney additionally reported that KM had appeared on the day the fact finding was supposed to begin and that she was expecting her to be present. The juvenile court noted that the case had been trailing since the previous Wednesday.

The DSHS' attorney reported that her first witness was going to be KM, but KM was not yet present. When asked how long the fact finding was anticipated to take, the DSHS' attorney replied two days, with the estimation that KM's testimony would take approximately half a day. KM's attorney reported that her only witness was KM.

The juvenile court then inquired about KM's attorney's contact with KM that morning. KM's attorney responded that KM did not answer the phone that morning so she left a message.

7

KM's attorney reiterated that KM had been calling every day and was in court the previous Wednesday. KM's attorney reported that she had told KM as soon as she knew something that she would contact her and that she contacted KM as soon as she received the call that morning to be at court. The juvenile court decided to take a recess until 1:30 PM so KM's attorney could attend a doctor appointment and have more time to contact KM.

When the juvenile court reconvened at 1:30 PM, KM was still not present. As a preliminary matter, KM's attorney objected to her testifying because KM was not on the DSHS' witness list. That day, the DSHS filed an amended witness list specifically adding KM and informed the juvenile court that KM's omission from the list was an oversight. The juvenile court ruled that it did not need to address the issue at that time because KM was not present to testify. The juvenile court then proceeded with preliminary matters, opening statements, and the testimony of the guardian ad litem. KM did not appear for the fact finding on Monday, September 26. The fact finding was held on that day from 1:31 PM to 2:42 PM.

On Tuesday, September 27, KM's attorney asked if the juvenile court could check to see if her client was in custody, as she had not heard from her since the previous Friday and there was a warrant for her arrest. KM's attorney also expressed concern because KM had been calling her every day. After KM's attorney expressed her concerns, the juvenile court proceeded with the fact finding.

The assigned social worker, Mariah Fabiani, testified on September 27. Fabiani testified that KM was offered random UAs, a chemical dependency assessment and treatment, a psychological evaluation, three different types of parenting education coaching, including Triple P, PFR, and Incredible Years; mental health counseling; and a domestic violence support group.

Fabiani additionally testified that KM was not offered housing assistance during the dependency because she did not ask for it. Fabiani reported that KM always told the DSHS when she was moving into a new place. When asked if special services are offered to HIV clients, Fabiani responded, "I do not know." RP (Sept. 26, 2016) at 111. Fabiani opined that the services offered would have helped KM correct her parenting deficiencies. Fabiani also opined that there was no likelihood that KM could correct her deficiencies in the near future. .

KM did not appear for the fact finding on September 27. At the conclusion of the proceedings that day, KM's attorney indicated that she did not know if her client was going to show up the next day for the fact finding. The fact finding was held this date from 9:05 AM to 11:28 AM.

On Wednesday, September 28, the DSHS rested its case. KM's counsel also rested because KM was not present, and KM was going to be her only witness. Both the DSHS' and KM's counsel made closing statements that day. The fact finding started that day at 9:08 AM and ended at 10:07 AM. KM did not appear.

B. COURT'S ORAL RULING AND KM'S APPEARANCE

On October 3, 2016, the juvenile court reconvened to give its oral ruling. Toward the end of the juvenile court's oral ruling, KM's attorney informed the juvenile court that KM had entered the courtroom. The juvenile court acknowledged KM's presence and then continued with its oral ruling.

After the court's oral ruling, KM's attorney informed the juvenile court that KM wanted to testify and that she "didn't know there was court until the day of court." RP (Oct. 3, 2016) at 161. When the juvenile court asked for clarification, KM stated,

9

I didn't get the court -- I didn't get that there was court until the following day. Then by the time I showed up, court was already over. I had been checking in from last week to find out if court was, when the date was going to be. I was just waiting to find out. I got an e-mail but I didn't get the e-mail until that day, the day of court. Now it was sent the day before, but wasn't sent until after 4:30. After 4:30, when I didn't get a call or text, I figured we didn't have court the next day. That was pretty disappointing.

RP (Oct. 3, 2016) at 161. KM's counsel interjected and stated that she recalled calling KM several times on the day the fact finding began.

The juvenile court responded by stating,

My understanding is this case was originally set for, I believe it was the 21st of September, which was a Wednesday. Then there weren't any courtrooms or departments to send it to. It was trailing --
. . . .
--at Remann Hall. It came to this court last Monday, which was the 26th. I know at that time, Ms. Tucker, you had been given an opportunity to try to get ahold of [KM]. You had indicated you had some communication with her over that time period from the 21st until the 26th. The expectation was she was going to be there. We waited for a while for her to arrive. We had court on the 26th, we had court on the 27th, we also had court on the 28th. Three days last week. Not for the full day, but portions of those days we had the trial. We had waited to give you an opportunity --

RP (Oct. 3, 2016) at 162. At this point, KM interjected to state, "I didn't know about any of those days. I hadn't spoken to Ms. Tucker since Friday of the following week." RP (Oct. 3, 2016) at 162. To which the juvenile court responded, "Well, this would seem to be consistent with what has happened." RP (Oct. 3, 2016) at 162. The DSHS' attorney interjected to state,

Your Honor, for the record, there was testimony that the mom had regularly contacted the social worker as well. At any time, the mother could have contacted the social worker through her e-mail, but she did not. There was testimony regarding there had been no contact with mom through e-mail, that was mom's preferred way. Mom did not check with the social worker either. It is our position the trial gave mom plenty of opportunity and to not reopen the case.

RP (Oct. 3, 2016) at 163.

The juvenile court then asked KM what day she came to court. KM responded that she was at Remann Hall on Wednesday, September 21, the day the fact finding was supposed to start. KM stated that she was told to stay by her phone and the following day she texted and then ended up calling because she did not get a text back. KM reported that she did the same thing on Friday and was told they were still waiting. KM stated that when she did not hear anything by 4:30, she figured that there "wasn't any court Wednesday, from Tuesday when I didn't hear from her until 4:30." RP (Oct. 3, 2016) at 164.

The juvenile court clarified that KM was talking about the week the fact finding was supposed to begin and asked KM what efforts she made during the week that the fact finding happened. KM responded, "That's what I'm saying. *I hadn't spoke to her since Friday of that week. Last week I was preparing for starting my new job. I was -- it is my fault for not reaching out.* I figured my lawyer told me to stay by my phone. I figured she would call me or text me and let me know." RP (Oct. 3, 2016) at 164 (emphasis added). The juvenile court then asked KM how she knew there was court that day, and KM responded, "Because I got the voice mail from her after court that day telling me, hey, your court is over and they are going to be doing a ruling Monday in Room 211. Wasn't sure of the time. I jumped up today, got ready and got down here." RP (Oct. 3, 2016) at 164.

The juvenile court then asked KM's attorney if she had anything further to add, to which she responded,

> Your Honor, I called every day that we had trial. I think Your Honor even allowed me to call when we came back from -- before -- let's see, when we started there was a recess, and when we came back I think I called again that day. I called and I sent e-mails. I can go back through my call log if Your Honor prefers me to do that.

11

RP (Oct. 13, 2016) at 164-65. The juvenile court responded that that was not necessary. KM added that she had been preparing for her testimony and had sent her attorney verification of her work and the four-hour alcohol awareness class that she did in anticipation of her testimony. KM's attorney then added,

> That was on the 21st, I received the documents. I remember I was called at 9:10 and told to be in court at 9:30. I called the client the day we were to start the trial. I didn't receive any message back or anything. I did leave several messages. I don't know if she was having problems with her phone or what was going on. I did attempt every day to keep her updated and to let her know about trial.

RP (Oct. 3, 2016) at 165. The juvenile court then stated that it was not going to reopen the case.

### C. WRITTEN FINDINGS AND CONCLUSIONS

On November 4, 2016, the juvenile court entered findings of fact and conclusions of law. The juvenile court found that (1) the DSHS had expressly and understandably offered or provided all necessary services reasonably available and capable of correcting KM's parenting deficiencies within the foreseeable future, (2) there was little likelihood that KM would remedy her parenting deficiencies so that DMM could be returned to her care in the near future, (3) KM was currently unfit to parent DMM, (4) continuation of the parent-child relationship clearly diminished DMM's prospects for early integration into a stable and permanent home, and (5) termination was in DMM's best interests. Accordingly, the juvenile court entered an order terminating KM's parental rights to DMM. KM appeals.

### ANALYSIS

### I. DUE PROCESS

KM argues that her right to due process was violated because she was given insufficient notice of the termination fact finding, and when she did appear she was not allowed to testify. KM

argues specifically that the *Mathews v. Eldridge*, 424 U.S. 319, 348, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), balancing factors do not support the means of notice she received and do not support the juvenile court's subsequent denial of her request to testify before the juvenile court entered its findings of fact and conclusions of law. We hold that the juvenile court did not deny KM due process.

## A. PRINCIPLES OF LAW

Parents have a fundamental liberty interest in the care, custody, and management of their child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct., 1388, 71 L. Ed. 2d 599 (1982). Even when a child is in a dependency, "parents retain a vital interest in preventing the irretrievable destruction of their family." *Santosky*, 455 U.S. at 753. "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures." *Santosky*, 455 U.S. at 753-54. "Preservation of the family unit is a fundamental constitutional right protected by the Fourteenth Amendment to the United States Constitution." *In re Welfare of L.R.*, 180 Wn. App. 717, 723, 324 P.3d 737 (2014).

We review de novo alleged due process violations. *L.R.*, 180 Wn. App. at 723. To determine whether a parent has received adequate due process, we must balance the three factors set forth in *Mathews*, 424 U.S. at 321. *L.R.*, 180 Wn. App. at 724. The *Mathews* balancing test requires weighing (1) the private interest at stake, (2) the risk that the procedure used will result in error and the probable value of additional or substitute procedural safeguards, and (3) the State's interest in retaining the procedure used and the fiscal or administrative burden if additional safeguards were provided. *In re Welfare of S.I.*, 184 Wn. App. 531, 541, 337 P.3d 1114 (2014), *review denied*, 183 Wn.2d 1002 (2015); *In re Dependency of A.G.*, 93 Wn. App. 268, 278-79, 968

P.2d 424 (1998). "Due process in the termination context requires that parents have notice, an opportunity to be heard and defend, and the right to be represented by counsel." *L.R.*, 180 Wn. App. at 723.

RCW 13.34.090(1) states, "Any party has a right to be represented by an attorney in all proceedings under this chapter, to introduce evidence, to be heard in his or her own behalf, to examine witnesses, to receive a decision based solely on the evidence adduced at the hearing." RCW 13.34.180(6) provides that "[n]otice of rights shall be served upon the parent" and must include a statement that the parent has the right to speak on their own behalf, to introduce evidence, to examine witnesses, and to receive a decision based solely on the evidence presented to the judge.

## B.  NOTICE

KM argues that given her vital interest at stake, the procedure used to inform her of the actual start date and time of the termination fact finding entailed an intolerably high risk of error. First, KM asserts that a phone call 20 minutes before fact finding is to begin is inadequate notice. She claims that under CR 6(d), she was entitled to five days written notice of the date the trial started. This argument rests on incorrect facts and thus is rejected.

Written notice of the September 21 fact-finding date was given to KM through her attorney. KM does not raise a lack of notice argument regarding the September 21 date. KM instead challenges the lack of notice regarding the September 26 and subsequent dates. Admittedly, testimony did not start on September 21. Instead, the trial remained on the docket from day to day until a judge became available as allowed in CR 40(a)(3). KM was not entitled to additional written notice of the date when testimony finally began.

14

On September 26, KM's attorney did only receive 20 minutes notice that the trial would start at 9:30. However, the juvenile court then recessed the trial until 1:30 in the afternoon, in part to allow KM's attorney to contact her. Over the course of the trial, KM's attorney called and e-mailed KM but received no response. KM does not explain why a half day of notice was inadequate nor why she completely failed to appear for any of the three days of trial. In fact, when KM finally did appear, after the fact finding had concluded, KM admitted that she had not stayed in contact with her attorney and that it was her "fault." RP (Oct. 3, 2016) at 164. Thus, her argument that her due process right was violated when she received merely 20 minutes notice fails.

KM next states that the "trailing" procedure used in her case was not defined by any court rule. We disagree.

A "trailing" trial schedule is authorized by CR 40(a)(3), although that precise term does not appear in the rule. When a case is not heard on the date set it need not be renoted, but instead the case "*shall remain upon the docket from session to session or from law day to law day until final disposition.*" CR 40(a)(3) (emphasis added). Thus her argument that "trailing" is not defined by any court rule fails.

KM next argues that reliance upon phone calls and e-mail to provide notice of the fact finding's specific start date and time here violated her due process right. We disagree.

KM had successfully used the telephone and e-mail to communicate with the parties in the past, albeit with occasional problems. And KM agreed that e-mail was the preferred method of communication. Thus, the use of e-mail and telephone was not an unreasonable method to use for communication of the fact-finding date here. KM stayed in contact with her attorney for the first two days following the original trial date but KM admitted that she failed to stay in contact with

15

her attorney thereafter. Thus, the cause of KM's absence from the fact finding was not an unreasonable method of notice but rather the failure of KM to stay in contact with her attorney. When a party fails to appear following notice of the trial date, it is not a due process violation to proceed to trial.

## C. *MATHEWS V. ELDRIDGE* TEST

The question remains however, whether the "trailing" process itself violates due process. To determine if there was a due process violation, we weigh the three factors outlined in *Mathews*.

Under the first *Mathews* factor, KM has a fundamental liberty interest in the care and custody of her child. *L.R.*, 180 Wn. App. at 724. Termination of parental rights is characterized as one of the most severe state actions. *L.R.*, 180 Wn. App. at 725. Due to KM's fundamental liberty interest, the first *Mathews* factor weighs in favor of giving written timely notice of a termination fact finding.

"The second [*Mathews*] factor assesses whether the hearing had sufficient procedural safeguards to insure that the parent had a full and fair opportunity to defend—i.e., to present evidence, rebut opposing evidence, and present legal arguments." *L.R.*, 180 Wn. App. at 725 (the infringement on the parent's interest involved her inability to attend only the first day of a three-day hearing).

Here, the issue is whether the notice given comports with sufficient procedural safeguards. Written notice personally served is the highest quality notice. Here, KM received written notice of the original fact-finding date through her attorney. KM asserts that the problem arose when the fact finding could not start on the assigned date, the juvenile court assigned the fact finding to "trail," and it started the fact finding with only a half-day notice to KM. Thus, the issue here is

whether requiring KM to stay in daily contact with her attorney by e-mail and/or telephone comports with due process after receiving written notice of a fact-finding date.

For the reasons discussed above, e-mail and telephone are reasonable communication methods that had worked successfully for KM in the past. Further, KM does not demonstrate why the burden of calling her attorney daily is unreasonable. We hold that requiring KM to call her attorney daily is not an unreasonable burden. If KM had maintained contact with her attorney, she would have had notice of the commencement of the fact-finding hearing and would have had the opportunity to be present to consult with her attorney about the State's evidence and to present testimony on her own behalf. Thus, we hold that the process used here comports with due process.

Under the third *Mathews* factor, the DSHS has a strong interest in protecting the rights of children, which includes the speedy resolution of the termination proceeding. *L.R.*, 180 Wn. App. at 727. Where written notice of the original fact-finding hearing is given and the methods of maintaining contact are reasonable, the third factor supports a conclusion that the juvenile court did not violate KM's right to adequate notice by attempting to hold the termination fact finding on the next available date.

The balance of the *Mathews* factors supports the conclusion that the juvenile court did not violate KM's due process rights when it required KM to stay in daily contact with her attorney by either e-mail or telephone. Thus, we hold that KM's due process right to adequate notice was not violated.

## D. REQUEST TO TESTIFY

KM next argues that the juvenile court further violated her right to due process by not allowing her to testify when she appeared in court on October 3, 2016. KM asserts that the risk of

error in her case was high, citing the DSHS' ignorance and lack of concern for her medical needs and insufficient evidence regarding necessary services. KM asserts further that the reopening of her case to take her testimony could have been done that day and required no burdensome continuance as the findings of fact and conclusions of law had not yet been written or entered. KM further asserts that the juvenile court noted that there were questions that remained unanswered due to the DSHS' ignorance of KM's significant health issues and life circumstances,[5] which should have been answered by her testimony. KM asks this court to reverse the termination order because her due process rights were violated.

We hold that the juvenile court did not violate KM's due process right to testify nor did it abuse its discretion when it denied her motion to reopen the trial so she could present testimony.

A parent's right to be heard is not self-executing, and he or she must take reasonable and timely steps to exercise that right. *L.R.*, 180 Wn. App. at 724. As discussed above, had KM contacted her attorney on Monday, she could have requested a continuance or she could have been present to testify. We hold that KM failed to take reasonable and timely steps to exercise her right.

Review of the *Mathews* factors also supports the conclusion that KM's due process rights were not violated when the juvenile court denied her request to testify on the day it gave its oral ruling. As discussed above, under the first *Mathews* factor, KM has a significant private interest that weighs in favor of ensuring an adequate process.

Under the second *Mathews* factor, there is a risk associated with the juvenile court not having the benefit of KM's testimony. Especially when both the DSHS' and KM's attorneys

---

[5] KM does not provide a citation to the record for this assertion and we did not locate such a statement by the juvenile court in the record.

intended to rely on her testimony. But any risk associated with KM not testifying could have been avoided by KM maintaining daily contact with her attorney and contacting her attorney on Monday to learn about the fact-finding date. The second *Mathews* factor supports the conclusion that KM's due process rights were not violated when the juvenile court denied her request to testify after she failed to maintain contact with her attorney and appeared only after the fact finding had concluded.

Under the third *Mathews* factor, the State has an interest in the speedy resolution of the case. Here, it was estimated that KM's testimony would take half a day, meaning the juvenile court would have had to reopen the fact finding for another half day of proceedings. On the day that KM made her request to testify, the parties were present for the juvenile court's oral ruling and the giving of the oral ruling was all that was scheduled. Nothing in the record indicates whether the parties or the juvenile court were available to proceed with at least a half day of fact finding at that time or if the juvenile court would need to schedule the half day of fact finding for another day.

On the other hand, no findings of fact or conclusions of law had been entered, and they were not entered until a month later. The fiscal and administrative burden of allowing KM to testify would be dependent on whether the juvenile court could have proceeded with her testimony that day or if it would need to schedule the half day of fact finding for another day. The burden being less if KM's testimony was that day and being greater if the juvenile court had to reconvene on another day to finish the fact finding.

Because this matter was set to receive only the juvenile court's oral ruling and the parties were not prepared for fact finding on this date, it is unreasonable to assume that the fact finding could occur upon KM's unexpected appearance and spontaneous request to testify—particularly

in light of the difficulty in scheduling this matter in the first place. Thus, the third factor also supports the conclusion that KM's due process rights were not violated when the juvenile court denied her request to testify after the fact finding had ended.

We hold that the second and third factors outweigh the first factor, as KM had the ability to avoid any risks associated with the juvenile court not hearing her testimony. Thus, under the *Mathew*s test, we hold that there was no due process violation. KM provides no authority that due process requires a trial court to reopen a fact-finding hearing after properly providing notice and opportunity to be heard at the fact finding.

Because KM failed to take reasonable steps to exercise her right to testify, we hold that the juvenile court did not deny KM's due process right to testify when the juvenile court denied her request to testify after the fact finding had concluded.

Further, the juvenile court did not abuse its discretion when it decided to not reopen the case. The decision to reopen a case for additional evidence is within the sound discretion of the trial court and will not be reversed except upon a showing of an abuse of discretion and prejudice resulting from the complaining party. *In re Welfare of Ott*, 37 Wn. App. 234, 240, 679 P.2d 372 (1984).

In the present case, the juvenile court gave KM's attorney ample opportunity to contact KM and inform her of the fact finding. KM failed to respond to her attorney's e-mails and phone calls, and KM failed to contact her attorney. The juvenile court gave KM an opportunity to explain why she missed the trial and what efforts she made to stay in contact with her attorney. KM admitted it was her fault for not staying in contact and that she had started a new job. The juvenile court recognized that KM had a history of not staying in contact. The juvenile court would have

20

had to reopen the case for approximately half a day of trial, and the record does not show whether it could have happened the day that KM appeared or whether it would need to be scheduled for another day.

The juvenile court has a duty to provide a speedy resolution in the best interest of the child. While KM's testimony may have been helpful to the juvenile court, it cannot be said that the juvenile court abused its discretion when it denied KM's request to testify after trial had concluded.

## II. NECESSARY SERVICES

KM also argues that the DSHS failed to meet its burden of proof that she was offered or provided all necessary services because the professionals in her case either ignored or did not know about her HIV status or homelessness.[6] We disagree.

The juvenile court may order termination of a parent's rights as to his or her child if the DSHS establishes the six elements in RCW 13.34.180(1)(a) through (f) by clear, cogent, and

---

[6] KM challenges the following findings of fact:

5.      The mother did not successfully complete any of the parenting classes or parenting educations courses offered.

6.      The mother did not provide documentation to the social worker or the [DSHS] that would provide additional information as to the need for the medical marijuana.

. . . .

IX.

All services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been offered or provided.

. . . .

15.      The mother's medical condition was known to the [DSHS], but there was no evidence of how those medical conditions, other than substance abuse and mental health affected her ability to parent.

Clerk's Papers (CP) at 76, 78. However, KM's arguments do not address these specific findings of fact, therefore we consider them abandoned and do not address whether they are supported by substantial evidence. *Spino v. Dep't of Labor & Indus.*, 1 Wn. App. 730, 732, 463 P.2d 256 (1969) ("An assignment of error which is not argued in the brief is deemed to have been abandoned.").

convincing evidence. RCW 13.34.190(1)(a)(i). Clear, cogent, and convincing evidence exists when the ultimate fact in issue is shown to be "'highly probable.'" *In re Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973) (quoting *Supove v. Densmoor*, 225 Or. 365, 372, 358 P.2d 510 (1961)). The DSHS also must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. RCW 13.34.190(1)(b).

Because the juvenile court has the advantage of observing the witnesses, deference to the court is particularly important in termination proceedings. *In re Welfare of Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980); *In re Dependency of K.R.*, 128 Wn.2d 129, 144, 904 P.2d 1132 (1995). We limit our analysis to whether substantial evidence supports the juvenile court's findings. *Sego*, 82 Wn.2d at 739. Substantial evidence is evidence sufficient to persuade a fair-minded rational person of the truth of the declared premise. *Bering v. SHARE*, 106 Wn.2d 212, 220, 721 P.2d 918 (1986). We do not review credibility determinations or weigh the evidence. *Sego*, 82 Wn.2d at 739-40.

Under RCW 13.34.180(1)(d), the DSHS must prove "[t]hat the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." In determining whether the DSHS met its burden, the juvenile court may consider "any service received, from whatever source, bearing on the potential correction of parental deficiencies." *In re Dependency of D.A.*, 124 Wn. App. 644, 651-52, 102 P.3d 847 (2004). Further, the DSHS does not have to provide services when the parent is unable or unwilling to make use of them. *In re Dependency of Ramquist*, 52 Wn. App. 854, 861, 765 P.2d 30 (1988). And even if the DSHS "inexcusably

fails" to offer services to a willing parent, termination is still appropriate if the services "would not have remedied the parent's deficiencies in the foreseeable future." *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001); *In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

The record demonstrates that the DSHS offered KM grief counseling, a psychological evaluation, PFR, Triple P, Incredible Years, a drug and alcohol assessment, outpatient treatment, random UAs, and a DV support group. Even if the DSHS failed to offer KM services, its failure would be excused because KM was either unable or unwilling to make use of her services. *Ramquist*, 52 Wn. App. at 861. The record demonstrates that multiple referrals had to be made for the same services and that KM failed to complete parenting classes, chemical dependency treatment, random UAs, and a DV support group. Fabiani testified that the services offered could have corrected KM's parenting deficiencies. The record also demonstrates that KM failed to maintain consistent contact with the DSHS and services providers and did not consistently attend visitation.

Additionally, termination would still be appropriate because these services would not have remedied her parenting deficiencies in the foreseeable future.[7] *T.R.*, 108 Wn. App. at 164; *Hall*, 99 Wn.2d at 850-51. KM's argument with regards to housing services specifically is unpersuasive as housing was not the primary reason reunification with DMM was not possible. Thus, the DSHS

---

[7] KM challenges findings of fact X, "[t]here is little likelihood that conditions will be remedied so that the above-named child can be returned to either parent in the near future," and X(4), "[t]he mother did not complete individual counseling or grief and loss counseling." CP at 78. However, KM makes no arguments with regards to these findings, therefore they are abandoned. *Spino*, 1 Wn. App. at 732 ("An assignment of error which is not argued in the brief is deemed to have been abandoned.").

was not required to offer housing services. *Wash. State Coal. for the Homeless v. Dep't of Soc. & Health Servs.*, 133 Wn.2d 894, 924, 949 P.2d 1291 (1997) ("We hold that a juvenile court hearing a dependency proceeding has authority to order DSHS to provide the family with some form of assistance in securing adequate housing in those cases where homelessness or lack of safe and adequate housing is the primary reason for the foster placement or the primary reason for its continuation."). Additionally, housing assistance was never a court-ordered service, and KM never made the DSHS aware that she had a need for housing assistance. KM fails to explain what HIV "services" were required and how those services would have remedied her parental deficits.

Finally, KM's reliance on *In re Parental Rights to I.M.-M.* is misplaced. 196 Wn. App. 914, 924-25, 385 P.3d 268 (2016). In that case, the court stated that even when services are not tailored to a parent's medical needs, the court must still consider whether the offer of properly tailored services would have been futile. *I.M.-M.*, 196 Wn. App. at 924. KM's assertion that futility is not a consideration when services have not been tailored to a parent's medical need is incorrect. Here, the case worker testified that all reasonably necessary services were offered or provided and even so, KM had failed to remedy her parental deficits. There are no reasonable grounds to believe that either "housing" or HIV services would have remedied KM's parental deficits particularly when lack of housing and HIV were not identified by the DSHS or KM as contributing factors during the dependency.

We hold that the juvenile court properly concluded that all reasonable services had been offered or provided.

No. 49710-7-II

CONCLUSION

The juvenile court did not violate KM's right to adequate notice of the termination fact finding because after having received notice of the original trial date, receiving instruction to maintain contact with her attorney, KM admits she failed to stay in contact with her attorney. Further, the juvenile court did not violate KM's due process right when it denied her request to testify after the fact finding had concluded. Finally, the juvenile court properly found that the DSHS offered or provided all necessary services.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

We concur:

MAXA, A.C.J.

MELNICK, J.